**Steven Allen PAGE, Appellant,**

v.

**James FULTON, Dorothy Fulton, and Diane Daigle, as Next Friend of Monica Page, A Minor, Appellees.**

**No. 09–00–040 CV.**

Court of Appeals of Texas, Beaumont.

Submitted Oct. 5, 2000.

Decided Nov. 2, 2000.

63

Joe D. Alford, Orange, for appellant.

Louis Dugas, Orange, for appellees.

Before WALKER, C.J., BURGESS and STOVER, JJ.

## OPINION

RONALD L. WALKER, Chief Justice.

This is a wrongful death suit. James Fulton, his wife Dorothy Fulton, and Diane Daigle, who was acting as next friend of Monica Page, a minor, sued Steven Allen Page for damages resulting from the death of his wife, Kathy Page. The jury found Steven Page killed Kathy Page, and awarded damages to Kathy Page's parents and minor child. The five points of error raised in this appeal concern the sufficiency of the evidence to support the jury's verdict.

When considering legal sufficiency or "no evidence" points, we consider only the evidence, and reasonable inferences therefrom, which viewed in its most favorable light supports the finding, and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965). If there is any probative evidence to support the finding, the point must be overruled. *Id.* Meager circumstantial evidence from which equally plausible but opposite inferences may be drawn is speculative and thus legally insuf-

ficient to support a finding. *Wal–Mart Stores, Inc. v. Gonzalez*, 968 S.W.2d 934, 936 (Tex.1998). A no evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.*

■■■ In a factual sufficiency challenge, we consider all of the evidence including that which is contrary to the verdict. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). We may sustain a factual insufficiency point only if we determine that the finding of a vital fact is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.* In conducting our factual sufficiency review, we are not free to reweigh the evidence and set aside a jury verdict merely because we feel that a different result is more reasonable. Before we sustain a point of error alleging the evidence is factually insufficient, we must detail the evidence relevant to the issues under consideration and clearly state why the jury findings are factually insufficient or are so against the great weight and preponderance of the evidence as to be manifestly unjust, why the findings shock the conscience, or why the findings clearly demonstrate bias, and articulate in what regard the contrary evidence greatly outweighs the evidence in support of the verdict. *Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986).

■■■ To withstand appellate scrutiny, the damages awarded by the jury must reflect an amount that, in the standard language of the jury charge, would fairly and reasonably compensate for the loss. *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex.1996). An award of mental anguish damages must be supported by direct evidence of the nature, duration, and severity of the plaintiffs' mental anguish, thus establishing a substantial disruption in their daily routine. *Latham v. Castillo*, 972 S.W.2d 66, 69–70 (Tex.1998)(*quoting Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex.1995)). If there is no direct evidence of mental anguish, we apply traditional legal sufficiency standards to determine whether the record reveals any evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger to support any award of damages. *Id.*

■■■ The standard of review for an excessive damages complaint is factual sufficiency of the evidence, employing the same test as for any factual sufficiency question. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex.1998).

Point of error one contends the evidence is legally and factually insufficient to support the jury's finding that Steve Page killed Kathy Page.

*Background:*

Steve and Kathy Page were married for over twelve years. They had two children, Erin and Monica. Kathy worked as a waitress at the Hoffbrau Restaurant in Beaumont. According to Kathy's sister, Sherry Valentine, the Pages had a rocky marriage and Steve slept on the couch. Sherry testified that during arguments Steve would grab or push Kathy. Steve denied ever physically abusing his wife. He also denied ever having a big argument with her. Steve's brother Ronnie testified he frequently visited the Pages and that he never saw Steve push or hit Kathy, or lose his temper towards her. The Pages' daughter Erin testified that she never saw her parents argue and never saw her fa-

ther sleep on the couch. Erin never saw her father push or physically attack her mother. The Pages' other daughter, Monica, testified she and her mother shared a bedroom.

Sherry testified that Steve and Kathy had an argument on May 6, 1991.

Kathy asked Steve for a separation, and during the week before Kathy's death Steve moved his belongings into an apartment across the freeway from their home in Vidor. Steve testified that he had no idea that Kathy was having an affair.

*Sunday, May 12, 1991:*

The whole family went to the beach on Mother's Day, then Steve fried shrimp. They had already planned that Steve would go to the new apartment that night, and they wanted to have a good day together with the kids. Steve spent the night in the apartment.

*Monday, May 13, 1991:*

Steve went to the house on Monday to help get the kids ready for school, then took them to school. He made some business calls, then returned to the house sometime before noon. That afternoon, Steve and Kathy washed the car together. They went separately to the ballpark for the girls' baseball games. Kathy was wearing bluejeans and a green shirt. After Monica's game ended, Kathy took Monica home. Kathy's normal practice was to park next to the house if she arrived home first. Steve stayed at the ballpark with Erin until her game ended, around 9:00. They returned to the house between 9:30 and 10:00.

Charlotte Swearingen Morgan testified that Kathy Page called her around 9:30 or 10:00. Kathy told Charlotte that she was going out, and reminded her not to answer her phone around midnight in case Steve checked up on her. Charlotte knew Kathy was meeting a particular man. This was the only time Kathy ever asked Charlotte to cover for her while she was meeting a man.

Steve testified that he left the Page house before 10:30, but Kathy called him and asked him to come back and watch the kids. He parked on the far side of the carport. When Steve arrived at the house, Kathy was wrapped in a towel. He approached her for sex. They had sex on the carpet in the living area. Steve testified that Kathy left the house between 11:15 and 11:30 p.m.[1] She was wearing a grey blouse, white pants, white shoes, a watch, earrings, and a wedding ring. Steve watched television for a short while, then went to bed sometime between 11:30 and 12:00. He slept in his underwear, under the sheet. Monica was sleeping in her bed in the same room. According to Steve, Kathy never came home.

Charlotte Swearingen's phone rang around 2:30 a.m. The caller hung up without speaking. She had gotten hang-up calls on other occasions, and had assumed it was Steve.

In the course of their investigation, the police learned that Kathy had been with another man at a hotel in Beaumont the night of May 13, 1991. When she left Beaumont at 2:30 a.m., Kathy was wearing the same clothing as that found on her body, except for her socks, watch, earrings, rings, and makeup. Those items were missing from her body.

Sherry testified that Kathy always had on her wedding ring, but always took off her earrings and watch when she went to bed. In preparing for bed, Kathy usually took a shower, and always took her makeup off and pulled her hair up.

*Tuesday, May 14, 1991:*

Detective Ray Mosely testified that he arrived at the scene soon after 5:00 a.m. Tuesday, May 14, 1991. Kathy Page's car was nose-down in a ditch 100 yards from her home. The car faced away from the house. There was very slight damage to the vehicle. There was no evidence that the brakes had been applied; the evidence

---

1. At a later point in his testimony, Steve de- nied having said that Kathy left after 11:00.

indicated only a slow roll into the ditch. The vehicle was extremely neat and clean, except for two Whataburger cups on the floorboard. The rear view mirror was turned left and touching the windshield. The only blood found in the car was located on the headrest.

Kathy Page's body was in the driver's seat. Her purse was upright on the seat. The seat belt had been disabled. Her head was tilted to the right, leaning against the headrest. There was blood at the back of her head, but no other blood was visible at the scene. Her nose had been broken. Marks on her neck indicated she had been strangled with a left hand. Closer inspection revealed "transfer blood" on the inside of her clothes, an indication that the clothes were put on the body after the injury was inflicted. A blade of grass on the bottom of the back of her jeans indicated the body had been dragged. She wore no makeup, no watch, no jewelry, no wedding band. He removed the body and placed it in an ambulance for transport to the hospital, took the car in, and went to the Page residence. No lights were on. Detective Mosely had known Steve Page for most of his life.

Steve wore only boxers when he answered the door. He was not putting shorts on. Steve said his wife was not there, and asked if it was about her. Steve stepped out and looked at the vehicles. Detective Mosely had not yet mentioned Kathy. Lieutenant Carter, who accompanied Mosely, told Steve that Kathy was dead. Steve became emotional, throwing himself on the couch and crying, but in the light of his flashlight Mosely noticed that Steve had no tears at all. Lieutenant Carter informed Steve that Kathy had been strangled. Steve did not ask to see his wife. Detective Mosely was there for 15 to 20 minutes. Steve was asked to turn the lights on, but he never did. Detective Mosely noticed that there were clothes on the living room floor.

Charlotte Swearingen testified that Steve Page called her between 5:30 and 6:00 a.m. He wanted to know where Kathy was. Charlotte told him that they had been out together, and that Kathy had left to go home about 2:00. He told her Kathy did not go home. Charlotte called the hotel where Kathy's friend was staying, but no one answered at his room.

Steve testified that he awoke just before 6:00. Kathy wasn't home, so he called her friend Charlotte Swearingen, who said Kathy had left at 3:00. Within minutes, the police arrived while he was dressing. According to Steve, he was pulling on his shorts when he opened the door. The policemen, who were long-time acquaintances of his, told Steve that Kathy was deceased and that it had been made to look like an accident but that it was not an accident. They told Steve that the car was located in a ditch 100 yards from the house. He could see flashing lights of police cars in the yard, and others down the street. Steve admitted that he stated that he didn't want an autopsy done. He did not ask to see Kathy, nor did he go to the scene.

Dorothy Fulton testified that shortly before 6:00 a.m., Steve Page called her with the news that something terrible had happened to her daughter Kathy. When she and her husband arrived at the Page residence shortly after 6:00, Steve was walking around the living room wiping his hands with a wet bath cloth. Steve was wearing red shorts, a white T-shirt, and was barefoot. He had a scratch on his nose.

Dorothy noticed that Steve was doing laundry early that morning, before the girls awoke. She did not see what he was laundering. There were clothes on hangers laid on the living room floor, although there was room for them to hang on the indoor line where Kathy normally dried her clothes. She did not notice any discoloration on the carpet. Kathy's bed had not been slept in.

Steve denied that he was doing laundry when Dorothy Fulton arrived, insisting instead that the only laundry done that day

was his daughter's sheets. He also denied having a scratch on his nose.

Reverend R.J. Ben Bienvenue testified that while it was still dark, he went into the Pages' kitchen to use the phone. He could hear the clothes washer on the spin cycle.

Patricia McKinley testified that her husband called her between 4:30 and 5:00 and told her that he had seen Kathy's car in the ditch, and the police. Patricia brought coffee over to the Page house between 6:30 and 7:30. Dorothy Fulton was already there, and the kids were still asleep. She was there for perhaps fifteen minutes, and went into the kitchen, but saw nothing to indicate they were washing clothes. She noticed no spills or stains either that day or when she returned on Wednesday or Thursday.

Steve's brother Ronnie testified he arrived at the Page house around 6:30. Ronnie never heard the washer. He did recall that they had to wash the girl's sheets.

Steve told Dorothy that Kathy had asked him to come over and watch the girls while she went out to have a drink with some girlfriends. Steve said that Kathy had been out drinking with friends the night before and that Kathy had driven off into the ditch and possibly broken her neck. Steve told Mrs. Fulton that he hoped he never found out who killed Kathy. He also mentioned that he did not want the police coming in his house because they may find blood on the carpet in the lounge where Kathy shaved her leg.

Steve denied telling Dorothy that Kathy had cut herself shaving. According to Steve, he made the comment about hoping they never find the murderer because a friend had told him that Kathy had been with a man in a hotel and because family members were saying she had used cocaine.

At trial, Steve admitted that his statement about Kathy having used cocaine was untrue. Kathy had a prescription for Valium. Steve explained that he was hearing rumors of drug use and made the mistake of repeating the rumors. He couldn't recall who told him that Kathy had been using drugs. At a later point in his testimony, it became apparent that Steve attributed the false information about Kathy to Steve's friend Roger Howell, who had been inquiring about Kathy among her friends and co-workers.

Jan Kelly, Kathy's sister, testified that she went over to the Page residence around 6:15. Steve was already doing laundry before the girls awoke. She saw him carrying clothes. Steve told her that Kathy had been out drinking that night, that she was probably drunk and taking Valium, that she went into the ditch and died. Steve also said that he didn't want the Vidor police in his house and that they would probably find blood on the floor in the carpet where Kathy had shaved her legs in the living room or the lounge. Steve said he hoped they never found out who killed Kathy. Jan asked him if he killed Kathy. Steve stated that he didn't kill Kathy and that he didn't even know she had a boyfriend. Steve also told her that he had called Charlotte around 2:30 and that Charlotte had told him that she had just left. During the course of the story, he changed the time of the call to 3:30, then 4:30. According to Jan, Kathy's bed was made until she turned down the covers after the girls got up. She noticed a lot of laundry on hangers laying around the floor but did not notice any blood.

James Fulton, Kathy's father, testified that he and his wife arrived at the Page house around 6:10, and he left shortly to tell his pregnant daughter Sherry the bad news in person. When he returned to the house around 7:00, he noticed Steve's car was parked on the right hand side of the carport under the shed. The police returned to the house and told Steve that they needed an autopsy. Steve said he didn't want anyone cutting on her. James "authorized" the autopsy. He heard Steve say he didn't want the police in the house because they may find some blood or

something in the living room area where she might have been shaving her legs. James tried to convince him to let the police in, but Steve said he knew the police department had planted stuff on some of his friends before.

Diane Daigle, Kathy's sister, received the news through a call to Crystal Beach around 6:30 a.m. She called Roger Howell and asked him to go be with Steve.

Roger Howell testified that Diane Daigle called him around 8:00 a.m. and asked him to check on Steve. He also claimed that she asked him to look into what had happened to Kathy, although Diane denied it. Roger went to Kathy's place of employment and asked her co-workers about men Kathy might have been seeing.

Erin and Monica woke up at 8:00, having slept through the night and early morning without hearing anything unusual. Someone laundered sheets soiled by one of the girls.

Before lunch, Roger Howell called Charlotte Swearingen at work and told her Kathy was dead. She wondered how he knew to call her there because it was her first day working at this new job.

Dorothy Fulton left the Page house at eleven. Later that afternoon, Dorothy Fulton learned that Kathy had been strangled.

James Fulton testified that he returned to the house at 11:00. Steve was laying across the bed asleep. While in the house, James noticed clothing on the floor, but did not notice any blood spots.

Steve testified that around noon on Tuesday, he learned that Kathy had been to a motel in Beaumont with another man.

Kathy's sister, Diane Daigle, arrived at the Page home around 1:00 p.m. She noticed that Steve's car was parked on the right side.

The police asked Steve about Kathy's jewelry sometime Tuesday. He looked in her jewelry box and noticed that her watches were gone.

Detective Mosely interviewed Steve Page at the police station on Tuesday afternoon. Steve told Mosely that he didn't want them in his house because they might find something that would incriminate him. A examination of Steve's face and hands revealed no marks.

A telephone call was placed from the Page residence to Steve's lawyer at 4:16 p.m. Steve denied making the telephone call, insisting that he was at the police station at that time. He supposed Roger or his brother made the call.

Marjorie Page, Steve's mother, testified that Steve cried tears when she saw him that night.

*Wednesday, May 15, 1991:*

Kathy's brother, Jimmy Fulton, visited Steve on Wednesday at 7:00 a.m., for about 30 minutes. Jimmy asked Steve if he killed Kathy. Steve said no, he would never hurt her, that he loved her. Steve said Kathy had been seeing other people. Steve claimed he had called Charlotte at 3:00 and Charlotte said Kathy had never been there.

Steve came to Dorothy and told her not to listen to Kathy's friends who were saying that he killed Kathy. Steve told her that Kathy was taking cocaine at night and Valium during the day. Steve mentioned that he had dropped some fish grease on the carpet in the lounge.

Sherry Valentine visited the Page residence on Wednesday. When Steve opened the door, she noticed and inquired about a very strong smell. Steve told her that he had spilled some grease and he was cleaning the carpet. There were some small oscillating fans in the kitchen that Steve stated were there to dry out the carpet. At 6:00, she was calling her mother when she noticed Steve and his friend, Roger Howell. Roger had a standard size manila envelope. They walked into Monica's bedroom, shut the door for a few seconds, then walked out and entered Erin's bedroom. They were in Erin's room for a few

minutes. The envelope was bulky and made a metallic sound. Roger testified that he brought over a paper bag containing candy. Steve testified Roger brought a bag of candy, not a manila envelope.

Theresa McFarland testified that on Wednesday a member of the Page family rented a carpet cleaner. According to McFarland, no one else was with her in the store, although someone could have been in the car. Her co-worker, Ellevy Joyner, testified that Steve Page was there with two women from his family and a little girl when the carpet cleaner was rented. Steve personally returned the cleaner.

Marjorie denied having rented a carpet shampooer on Wednesday.

On Wednesday, Monica and Erin were subpoenaed to appear before the grand jury the following day. Steve testified he first contacted a lawyer on Wednesday, after a grand jury subpoena had been served. Steve made a number of calls to his lawyer in the following days.

Steve's sister, Donna Singleton, arrived at the Page home Wednesday night. Steve was very upset and remained depressed for the next two weeks. He cried tears. There was no blood anywhere.

*Thursday, May 16, 1991:*

At the funeral home on Thursday, Steve appeared to feel faint. Roger Howell told Jimmy Fulton that Kathy had gotten wild. Roger asked to view Kathy's body. Jimmy agreed. Roger asked Jimmy to leave the room. Jimmy refused, but did turn his back. Roger touched Kathy's face and body, and made a sketch of her face on a piece of paper. Roger, however, denied touching Kathy, sketching her, taking any pictures, taking any jewelry off of her, or putting any jewelry on her.

On Thursday evening, Diane heard Steve say he hoped they never found the killer.

*Friday, May 17, 1991:*

The funeral was Friday. According to Sherry, Steve looked distraught but he wasn't crying. He wouldn't say Kathy's name, referring to her body as "it." Marjorie testified that Steve was very emotional during the funeral.

*Saturday, May 18, 1991:*

Steve insisted that he spilled the grease on Saturday. According to Steve, the grease spilled in the same spot where he and Kathy had sex the night she died.

Dorothy Fulton testified that Steve was burning something in the backyard on Saturday.

Steve explained that he had missed trash collection on Tuesday, so he decided to burn the trash in the backyard. A mayonnaise jar full of grease, which he was carrying out to throw on the trash pile, slipped out of his grip, losing its top and rolling on the carpet without breaking. They cleaned up the grease with towels and burned the towels. Steve denied renting a carpet cleaner, and testified that the carpet was cleaned with a carpet cleaner he already owned.

Erin testified that she personally witnessed the grease being spilled when the jar popped out of Steve's hands and the top popped off, but she did not testify as to the date it occurred. Monica testified that no grease was spilled, nor was the carpet shampooed. Marjorie testified that the grease was spilled after the funeral. She, too, saw it happen. She recalled the top slipped off, although she had previously testified that there was no top on the jar. Marjorie also testified that Steve already had a carpet shampooer, and denied having rented one. Steve's sister Donna also claimed to have been an eyewitness to the spill. She testified that the top popped off and the jar rolled six or eight feet.

*Sunday, May 19, 1991:*

When Dorothy Fulton came over to the Page house on Sunday, Steve's sister-in-law Linda was shampooing the carpet. James Fulton testified three people, in-

cluding Steve's mother, were working on the carpet.

Steve told Dorothy that he couldn't find Kathy's watches and that they had all disappeared.

Jimmy Fulton testified that Steve's mother, sister, and sisters-in-law were all working on cleaning the carpet. Steve's mother said he wouldn't believe it but they had spilled grease on the carpet. Jimmy didn't believe it because the path to the side door was covered with linoleum. They were working on one spot, not a trail of grease. By that time, the Fultons knew from the autopsy that Kathy had lost some blood. At that moment, Jimmy realized Steve had killed Kathy.

*Aftermath:*

The next week, Steve called Diane Daigle and asked to meet with her. Steve told her that her father was out to get him. Diane asked if he killed Kathy. Steve said no, he didn't even know she had a boyfriend, and walked away.

Steve asked Jan to come over to the house because he thought the Vidor Police were going to plant something in the house. The Friday after the funeral she came over with Sherry and Diane, but Steve never left.

Later in the summer, Dorothy saw Steve and Erin at the mall. Steve told her they had found Kathy's watches on a shelf in Erin's room. Erin reminded her father that she had told him she had not put the watches there. According to Steve, all of the watches showed up, except for the one Kathy wore the night she died. At trial, Erin had no recollection of her father saying the watches were in her closet.

Steve admitted he kicked flowers off of Kathy's grave. He attributed this action to anger over her family's behavior. He claimed that Kathy's sister Sherry told him that they would do everything they could to harm the children. Erin testified that Sherry left an anonymous bomb threat note on Erin's schoolbus.

Jan testified that after Kathy's death, Steve would regularly drive around her house and her sister's house.

Years after the murder, a Luminal search for blood was conducted on the carpet at the Page residence. The test was inconclusive. Tests conducted on soil from the backyard were also inconclusive. Ronnie Page testified that he was living in the house when it was searched, and the carpet was in the house then as when Kathy was killed.

Randy Anders testified that he once witnessed Steve Page signing a contract with his left hand. Steve denied it. Marjorie Page, Steve's mother, testified that Steve is right handed. Erin agreed. So did a family friend, Patricia McKinley. James Fulton testified Steve used both hands while working. Jan testified Steve could shoot baskets with his left hand. Steve's brother, Ronnie Page, testified that Steve is right handed and that he had never seen Steve do anything with his left hand other than shoot baskets.

Steve told Monica that they would probably move into a bigger house with the insurance money.

▬▬▬ On appeal, Steve Page argues that the circumstantial evidence supports mere surmise or suspicion that does not support a reasonable inference that he killed Kathy Page. "[S]ome suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence...." *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex. 1993). "Where there is real evidence, we must uphold the jury verdict, but ... where there is only real suspicion, we must overturn it." *Id.*

▬▬▬ Steve had a motive for killing Kathy. There is evidence that the Pages engaged in volatile arguments, and that Steve had acted out physically towards her in the past. That Steve and other witnesses denied that he abused Kathy does not mean the jury could not believe the witness who said that he did. In addition

to the evidence of the emotionally charged atmosphere in the household, there was an obvious crisis in the Page family. Kathy was having an affair and had just moved Steve out of the house into an apartment. They were divorcing. Although Steve denied having knowledge of the affair, there is circumstantial evidence that Steve followed Kathy to Beaumont; although he claimed he never left the house, his car moved from one side of the carport to the other. A telephone caller to Kathy's friend hung up without speaking, but Steve contradicted himself by first telling people that he had spoken to Charlotte in the middle of the night and been told that Kathy had left, then denying he called Charlotte before 5:30. Steve also mentioned Kathy having a boyfriend hours before he supposedly first learned she was seeing another man.

Someone arranged the body to make it appear that Kathy had died in an accident. Steve does not contest the homicide finding, but argues there is no evidence, or insufficient evidence, that he is the person responsible for Kathy's death. The circumstantial evidence supports an inference that Kathy did reach home before she died. The car was found very near the house, and pointing away from it. Makeup, clothing, and personal effects on her person when she left Beaumont were not on her body. Kathy was re-clothed after she was killed. Steve argues that it is just as plausible that Kathy was killed at a remote location, but the evidence that she had engaged in her nightly toilette makes it more likely that she reached her home.

Steve admitted having sex with Kathy the night she died. His explanation is not particularly credible. Steve claims that the day after she kicked him out of the house, Kathy willingly had sex with him on the living room floor moments before leaving the house to meet another man. While it is possible, the jury did not have to believe it, especially considering that a few hours later Kathy was beaten and strangled to death. The jury could have believed that Kathy returned home and that Steve had sex with Kathy then.

There is conflicting evidence whether Steve is left-handed or right-handed. There is evidence, however, of his strength and dexterity with both hands, so that Steve could have held Kathy's throat with his left hand while he struck her on the face with his right hand. At any rate, the evidence does not eliminate Steve.

Steve's behavior following the discovery of Kathy's body indicates guilt. From his first contact with the police, Steve knew Kathy had been murdered, yet he failed to mention it to her family, instead repeatedly stating that Kathy had killed herself in an automobile accident, something he knew to be false. He also falsely stated that Kathy had been using cocaine. It appears Steve deliberately mislead Kathy's family about how she died.

Steve also supplied an implausible explanation for why blood might be found in the very spot where he admitted to having had sexual intercourse. His explanation for why his family spent days shampooing the carpet in the same spot is highly suspicious, considering several witnesses testified that he mentioned spilling grease on the carpet days before he claims the spill occurred. Likewise, Steve was washing laundry the morning his wife was murdered, although he did not live there, his daughters were still asleep, and his wife would not need fresh clothing. He and a friend went from room to room putting things in an envelope. All of Kathy's watches disappeared after it was discovered that the watch she had been wearing in Beaumont was not recovered from her body. The jury also heard evidence that Steve was afraid the police would discover incriminating evidence in the house. While Steve supplied innocent explanations for his activities in the days following Kathy's murder, considering all of the circumstances together, the jury could have rejected those explanations and inferred that Steve was tampering with evidence in the house. Likewise, the jury could have

decided Steve's hostile actions at Kathy's grave were directed towards her rather than her family.

Viewed in the light most favorable to the verdict, we cannot say that the circumstantial evidence is equally susceptible to conflicting inferences or theories. If, as the circumstantial evidence indicates, Kathy returned to her home before she was killed, there was only one person there who had both the motive and opportunity to kill Kathy: Steven Page. More than a scintilla of evidence supports the jury's finding that Steve Page killed Kathy Page.

Controverting evidence was presented on key issues in the case. Both the plaintiffs and the defendant presented witnesses, some of whom had no motive to lie, but whose recollections differed dramatically. Only the jury may resolve the significant contradictions in the testimony. We cannot say the jury must have believed Steve's explanations because they are plausible, because the jury could have found his explanations to be implausible. The evidence preponderating in favor of the jury's finding is not so weak, nor is the evidence preponderating against the jury's finding so overwhelming, as to lead us to conclude that the verdict is clearly wrong and unjust. Point of error one is overruled.

■ Point of error two contends the evidence is legally and factually insufficient to support the jury's answer to Question 2, awarding Diane Daigle, as next friend of Monica Page, damages in the amount of $50,000. Point of error three urges that award is excessive. Question 2 directed the jury to consider pecuniary loss, loss of companionship and society, and mental anguish. Kathy Page was employed as a waitress, but there is no evidence of the amount of money she earned or the extent of her contribution to Monica's lifestyle, nor is there any evidence of the extent of her estate.

There is little evidence of Monica's relationship with her mother, but all of the evidence presented to the jury supported a conclusion that Kathy and Monica had a normal, harmonious, relationship in which Kathy nurtured her daughter. First of all, Monica lived with Kathy, even after Steve moved out. Monica testified that she got along fine with her mother, and Kathy was always in a happy mood. Steve testified that Kathy helped get the children ready for school and took them to ball games. Kathy would get Monica ready for bed. She was a moderate housekeeper. Kathy's death disrupted Monica's other family relationships, too; Kathy would take Monica to the Fultons', but now they have no contact because the Fultons accused Steve of killing Kathy. Now Monica's sister takes care of her.

Given the evidence that Monica and Kathy enjoyed a normal, nurturing relationship, the jury could award damages for the loss of society and companionship that Monica Page would, in reasonable probability, have received from Kathy Page had she lived. The appellant complains that an award of $50,000 is excessive, but does not explain why. This is a case in which a seven year old girl was deprived of her mother by an act of murder. The sum awarded by the jury is not so great that it shocks the conscience. Points of error two and three are overruled.

■ Point of error four contends the evidence is legally and factually insufficient to support the jury's answer to Question 3, awarding Dorothy Fulton and James Fulton damages in the amount of $150,000. Point of error five urges that award is excessive. Question 3 directed the jury to consider pecuniary loss, loss of companionship and society, and mental anguish.

There is little in the cold record to reveal the effect of Kathy's death upon her father James, other than the dogged determination with which he pursued Steven Page. A single question was submitted for both James and Dorothy Fulton. The award may be upheld if there is evidence supporting an award of damages for either

parent. Dorothy said of Kathy: "It's hard to describe Kathy without getting emotional. She was my friend. We went shopping, we had lunch. She loved me, she loved her family, she loved her girls, she loved her dad, she loved her sisters. It's hard to sit up here and describe someone that you love so much, and miss." Dorothy testified that they were a close family. Asked if she was as calm when she heard the news about her daughter as she appeared at trial, Dorothy responded that her emotions were very much affected, and even eight years later, "I can still hardly think about it." Although Kathy would take the girls to the Fultons', since her death neither Erin nor Monica has any relationship with their maternal grandparents.

Given the evidence that the Fultons were a close family that enjoyed warm and frequent contacts with Kathy and her children, and that eight years after her daughter's death Dorothy could barely stand to think about it, the jury could award damages for mental anguish and for loss of society and companionship. The appellant complains that an award of $150,000 is excessive, but does not explain why. Not only was the Fultons' beloved daughter murdered, but they slowly realized that a loved and trusted member of the family was responsible for her death. The sum awarded by the jury is not so great that it shocks the conscience. Points of error four and five are overruled. The judgment is affirmed.

AFFIRMED.