**Opinion issued December 2, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00596-CV

————————————

**CHRISONDATH BADALL, Appellant**

**V.**

**RUKMIN DURGAPERSAD, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF RAMDATH DURGAPERSAD, SUSAN DURGAPERSAD, RESHMA DURGAPERSAD, AND REHKA DURGAPERSAD, Appellees**

---

**On Appeal from the 75th District Court**
**Liberty County, Texas**
**Trial Court Case No. CV-70552**

---

## O P I N I O N

Appellees, Rukmin, Susan, Reshma, and Rehka Durgapersad (collectively, "the Durgapersads") filed suit against appellant, Chrisondath Badall, asserting a

cause of action for the wrongful death of Ramdath Durgapersad. A jury found in the Durgapersads' favor, and the trial court entered judgment based on the jury's verdict. In five issues on appeal, Badall challenges the trial court's judgment, arguing that (1) the evidence is legally and factually insufficient to support the jury's finding that he was 100% liable for Ramdath's death; (2) the evidence is legally and factually insufficient to support the jury's award of damages; (3) the trial court erred in failing to allow evidence of a purported settlement agreement between the Durgapersads and the hospital where Ramdath was taken following the shooting; (4) the trial court erred in excluding his impeachment evidence against Rukmin Durgapersad; and (5) the trial court erred in failing to dismiss the Durgapersads' suit for want of prosecution.

We affirm.

## Background

In January 2004, Badall shot Ramdath Durgapersad in the tire shop Ramdath owned and operated in Liberty County, striking him in the hand and abdomen. Ramdath was taken to St. Elizabeth's Hospital in Beaumont, where he died the next morning. Following a police investigation, Badall was charged with murder. In September 2005, a jury convicted Badall of Ramdath's murder and assessed his punishment at fifty-five years' confinement. The court of appeals affirmed his conviction, and the Court of Criminal Appeals refused Badall's petition for

2

discretionary review. *See Badall v. State*, 216 S.W.3d 865, 866 (Tex. App.—Beaumont 2007, pet. ref'd).

In January 2006, the Durgapersads filed suit against Badall, asserting a cause of action for wrongful death.[1] Rukmin brought the action "individually and in her capacity as Administratrix of the Estate of Ramdath Durgapersad, the decedent," and Susan, Reshma, and Rekha, their children, were named as plaintiffs. The amended petition alleged that Badall murdered Ramdath, who was fifty-six at the time of his death, and stated that,

> [a]s a result of [Badall's] wrongful conduct which led to [Ramdath's death], [Ramdath] endured significant conscious pain and suffering before his expiration on January 9, 2004; and Plaintiffs suffered damages, including, but not limited to, pecuniary and statutory damages as well as compensation for the pain and suffering endured by [Ramdath] prior to his death.

The Durgapersads sought damages for Ramdath's past medical bills and funeral expenses; past and future loss of earning capacity; pain and suffering; mental anguish; loss of consortium; loss of inheritance; punitive damages; and pre- and post-judgment interest.

Badall asserted the affirmative defenses of assumption of the risk, comparative responsibility, and self-defense. Subsequently, the Durgapersads moved for summary judgment, arguing that Badall was collaterally estopped from

---

[1]    *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 71.001–71.051 (Vernon 2008).

3

re-litigating issues decided in the criminal case. They provided affidavits summarizing the damages that they sustained as a result of Ramdath's wrongful death. Badall argued, among other things, that summary judgment was improper because his prior conviction did not preclude the possibility that Ramdath attempted to shoot him, which would impact his civil liability, and because there were fact questions regarding the Durgapersads' damages.

The trial court granted the Durgapersads' motion for summary judgment and ordered that they recover $1,200,000 as damages. However, on appeal, the Ninth Court of Appeals held that there were fact questions regarding damages and reversed and remanded the case for a new trial. *See Badall v. Durgapersad*, No. 09-08-00188-CV, 2009 WL 857995, at *2–3 (Tex. App.—Beaumont Apr. 2, 2009, no pet.) (mem. op.).

On remand, the trial court set the case for a new trial on March 14, 2011. The Durgapersads failed to appear, and the trial court dismissed the suit pursuant to Rule of Civil Procedure 165a. However, the Durgapersads moved to reinstate the case on the ground that their failure to appear was the result of a miscommunication with the trial court's clerk. On April 8, 2011, the trial court granted the Durgapersads' motion to reinstate the case and set the case for a new trial date. Badall moved again to dismiss the case for want of prosecution, but the trial court denied his motion.

4

A trial on the merits occurred on June 11, 2013. Rukmin Durgapersad testified that Badall shot and killed her husband. The trial court admitted into evidence Badall's judgment reflecting his conviction for Ramdath's murder. Rukmin testified that she and Ramdath were from Trinidad and were married in Puerto Rico. She testified that she moved to the United States in 1971, and that Ramdath came in 1973. Rukmin and Ramdath had four children: Ragis, their only son, and daughters Susan, Reshma, and Rehka. Rukmin testified that the family was close and that Ramdath regularly visited with his children. The family would go on vacations together about once a year. Rukmin testified that the entire family went to Trinidad in July before Ramdath died, that they enjoyed regular fishing trips to the Gulf Coast, and they were all together for Christmas just weeks before Ramdath's murder.

Rukmin testified regarding the effect Ramdath's death had on herself and her children. She stated that Ragis, her son, died of a heart attack at age thirty-three on the first day of Badall's murder trial. Ragis had two children.

Susan, who was thirty-six at the time of trial, is a dentist. Rukmin testified that Ramdath "did everything for [Susan]" up until the time of his death, including paying her way through dental school and buying her books. Rukmin testified that after Ramdath's death, she had to pay Susan's car note until she graduated and that she "did everything for graduation for her." Ramdath also provided advice and

5

counseling to Susan about her schooling and her future. Rukmin testified that Susan wanted her father to see her graduate, but he was murdered before she completed her studies. Rukmin testified that Susan is married but "she still carries [Ramdath's] last name. She [doesn't] want to give it up." Susan also has three children that Ramdath was never able to meet due to his untimely death.

Reshma, the middle daughter, also suffered because of her father's death. Reshma had a close relationship with her father. Reshma was pregnant with her first child at the time of Ramdath's death. Rukmin testified that on "January 8th when Mr. Badall shot [Ramdath] and killed him, [Reshma] went in the hospital the next day and had the baby. She couldn't even be a part of the funeral. She didn't see her dad." Ramdath provided advice, counsel, and financial support to Reshma.

Rekha, the youngest, was thirty at the time of trial and was teaching summer school in Louisiana. Rukmin testified that all of her daughters wanted to be present at the trial, but "they didn't want to relive it like I am right now. They didn't want to relive what happened to their dad." Like the other two daughters, Ramdath provided advice, counsel, and financial support to Rekha. He paid for Rekha to attend Louisiana State University and bought her a car in 2003. Following Ramdath's death, Rekha quit her studies for a time before returning to the university.

Rukmin testified that all of her daughters suffered because of their father's death, especially Rekha. According to Rukmin, "They all suffered. They all took it hard, and they still do. . . . My little daughter, it almost took her life." Rukmin testified that she did not keep photographs of the family around because she did not want to see reminders of happier times. She testified, "I'm trying to get over it, but I can't." Rukmin testified that Ramdath's death left her "without a husband, my soul mate, my friend, my everything," but she also acknowledged that she and Ramdath had some arguments and disagreements. As a result of Ramdath's murder, Rukmin testified that she suffered a heart attack and that she takes medication for stress. She testified that she has not slept well since the murder, that she has "been in and out of the doctor's office or hospital," and that she misses her husband every day.

She testified that his death also impacted her financially. She testified that, prior to his death, Ramdath "paid all the bills and did everything for us." Rukmin stated, "It's very hard. I had to learn everything the hard way," like learning to run the tire shop. She testified that she did not know anything about it because Ramdath "did everything" while she worked in Louisiana where Rekha was in school. Rukmin testified that she came to Texas on the weekends and cooked and cleaned for Ramdath for the six years she was working in Louisiana and that she had retired just a few months before Ramdath's death so that she could stay with

him in Texas. She testified that Ramdath "provided everything" for her and that it was difficult for her to continue to meet her financial burdens, such as providing money to her children and meeting living expenses, after Ramdath's death. Rukmin also testified that she paid between $8,000 and $9,000 to have Ramdath cremated.

On cross-examination by Badall, Rukmin testified that she knew her husband owned a firearm. She testified that she did not know her husband to carry the weapon on his person and that he kept it in his bedroom closet, hidden under some blankets so their grandchildren wouldn't find it. Rukmin testified that she did not see him with the firearm on the day he was murdered and that when police asked her about any weapons Ramdath owned, she showed them the firearm in the bedroom closet. Rukmin denied seeing Ramdath shooting at Badall, and she testified that Ramdath came upstairs, bleeding, to ask her to call 9-1-1. When Badall asked, "Do you have any knowledge what happened with your husband's handgun after he was shot?" Rukmin replied that she was "confused" by the question because Ramdath's firearm was always in the closet. Rukmin denied taking the firearm from Ramdath after the shooting and hiding it in the closet.

Rukmin testified that she did not actually see Badall shoot Ramdath, but she knew "[Badall] didn't act in self-defense because [Ramdath] didn't have a gun." She testified that Ramdath was transported to a local hospital following the

shooting, but she did not ride with him in the ambulance. She testified that she was able to speak to him again at the hospital, where he died early the next morning. Badall then asked about potential settlements Rukmin had reached with the hospital, but Rukmin denied the existence of any other acts of negligence or settlements with the hospital.

Badall argued, in his opening statement and in his closing argument, that he shot Ramdath in self-defense. Badall asserted that Ramdath shot at him repeatedly, putting Badall in fear of his life so that he had to shoot Ramdath. Badall argued that, after he shot Ramdath, Ramdath ran upstairs to the bedroom and stashed his weapon in the closet, or, alternatively, that he ran upstairs, handed the weapon to Rukmin, and she hid the weapon in the closet. However, the only testimony that Badall gave at trial was his admission that he shot Ramdath "in self-defense." He also testified that he was convicted of that murder and at the time of trial was still serving his sentence for that crime. Badall testified that he submitted his self-defense issue to the jury in the criminal case, but that jury rejected his defense.

Badall also called two police officers to testify about the day of the shooting. Officer E. Taylor testified that she arrived after other officers had already arrived on the scene. She was not the investigator for the case, but she did collect a few items of evidence, including the pieces of a broken watch that she found outside

9

the tire shop. She testified that she might also have collected some shell casing, but she could not recall with certainty the type, number, or location. Officer Taylor observed a large pool of blood at the foot of the stairs leading up to the apartment above the shop, and she saw a trail of blood on the stairs leading toward the office. Officer Taylor testified that she asked Rukmin Durgapersad whether Ramdath had any weapons. Rukmin took her upstairs and showed her a firearm, which was in a bedroom closet under a pile of blankets. Officer Taylor did not recall seeing any blood in the bedroom or near the closet, and she did not collect the firearm from the closet as evidence.

Officer M. Custer testified that he was the first officer who arrived on the scene. He did not recall seeing a gun or any shell casings, and he did not collect any evidence at all. He testified that he followed a trail of blood leading up a set of wooden stairs, and he found Ramdath lying on the floor of the office area.

The jury found that Badall assaulted Ramdath. The jury also found that Badall alone was negligent and that Badall's failure to use ordinary care was the proximate cause of "the occurrence in question." The jury awarded Ramdath's estate $100,000 for pain and mental anguish suffered by Ramdath before he died and $3,000 for burial expenses. The jury awarded Rukmin $66,000 and each daughter $18,000 for "pecuniary loss sustained in the past," and it awarded Rukmin $66,000 for future pecuniary loss. The charge defined pecuniary loss as

10

"the loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance."

The jury also awarded Rukmin $105,000 and each daughter $30,000 for past and future loss of companionship and society. The jury charge defined "loss of companionship and society" as "the loss of the positive benefits flowing from the love, comfort, companionship, and society that [the Durgapersads], in reasonable probability, would have received from Ramdath Durgapersad had he lived." The jury awarded Rukmin $41,250 and each daughter $11,250 for past and future mental anguish, which the charge defined as "the emotional pain, torment, and suffering experienced by [the Durgapersads] because of the death of Ramdath Durgapersad." Finally, the jury found that Badall acted with malice or gross negligence and awarded exemplary damages of $50,000.

The trial court entered its final judgment based on the jury's verdict, awarding the Durgapersads a total of $753,885.50. This appeal followed.

## Sufficiency of the Evidence

In his first two issues on appeal, Badall argues that the evidence was legally and factually insufficient to support the jury's finding that he was 100% liable for Ramdath's death or to support the jury's award of damages to the Durgapersads.

11

## A.    Standard of Review

When conducting a legal sufficiency review, we credit favorable evidence if a reasonable fact-finder could do so and disregard contrary evidence unless a reasonable fact-finder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Brown v. Brown*, 236 S.W.3d 343, 348 (Tex. App.—Houston [1st Dist.] 2007, no pet.). We consider the evidence in the light most favorable to the finding under review, and we indulge every reasonable inference that would support the finding. *City of Keller*, 168 S.W.3d at 822. We sustain a no-evidence point only when the record discloses one of the following situations: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is not more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810.

In a factual sufficiency review, we consider and weigh all of the evidence and set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

When the parties have not objected at trial to the substance of the law set forth in the jury charge, we review sufficiency of the evidence in light of legal

standards contained in the unobjected-to charge. *See, e.g.*, *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge.").

## B. Evidence Supporting Badall's Sole Liability

In his first issue, Badall complains that the evidence is legally and factually insufficient to support the jury's finding that he was "more than 51% liable for the death of Mr. Ramdath Durgapersad." He complains that the Durgapersads relied primarily on the fact that Badall was charged with and convicted of Ramdath's murder. Badall argues that the Durgapersads "did not present any . . . evidence whatsoever to establish by a preponderance of the evidence Mr. Badall did NOT act in self-defense against [Ramdath's] threat of harm." He argues that the jury's finding in his criminal conviction that he did not act in self-defense is not conclusive proof justifying the rejection of his self-defense argument under civil standards.

The Durgapersads bore the burden of establishing their wrongful-death claim. Civil Practice and Remedies Code section 71.002 provides a cause of action for wrongful death: "A person is liable for damages arising from an injury that causes an individual's death if the injury was caused by the person's or his agent's or servant's wrongful act, neglect, carelessness, unskillfulness, or default." TEX.

13

CIV. PRAC. & REM. CODE ANN. § 71.002 (Vernon 2008). The jury found that Badall's failure to use ordinary care was the proximate cause of Ramdath's death, and it declined to ascribe any liability to Ramdath himself.

The Durgapersads presented evidence that Badall was responsible for Ramdath's death. Rukmin testified that Badall murdered her husband by shooting him and that the gunshot wound was the cause of Ramdath's death. The trial court also admitted Badall's conviction for Ramdath's murder, and Badall himself admitted that he shot Ramdath.

We conclude that the evidence was legally sufficient to support the jury's finding that Badall was solely responsible for Ramdath's wrongful death. *See id.*; *City of Keller*, 168 S.W.3d at 810.

Badall argues, however, that he shot Ramdath in self-defense. With the exception of the rule of evidence that gives a person accused of a crime the benefit of a reasonable doubt, the law of self-defense is the same in both civil and criminal cases. *Gibbins v. Berlin*, 162 S.W.3d 335, 340 (Tex. App.—Fort Worth 2005, no pet.) (citing *Forbes v. Lanzl*, 9 S.W.3d 895, 900 (Tex. App.—Austin 2000, pet. denied) and *Foster v. H.E. Butt Grocery Co.*, 548 S.W.2d 769, 771 (Tex. Civ. App.—San Antonio 1977, writ ref'd n.r.e.)). A person is justified in using force against another when, and to the degree, such person reasonably believes the force

14

is immediately necessary to protect himself against the other's use or attempted use of unlawful force. *Id.* (citing TEX. PENAL CODE ANN. § 9.31 (Vernon 2011)).

We observe that self-defense is an affirmative defense. *See id.* ("[I]n civil law [self-defense] is a plea in confession and avoidance. That is, it is an affirmative defense."). Badall—not the Durgapersads—bore the burden of establishing that he acted in self-defense. *See Zuliani v. State*, 97 S.W.3d 589, 594 n.5 (Tex. Crim. App. 2003) (holding defendant bears burden of production in establishing self-defense); *see also Gibbins*, 162 S.W.3d at 340 (holding that, except for benefit of reasonable doubt standard applied to alleged criminals, law of self-defense is same in both criminal and civil context).

Badall argues that he "clearly asserted the fact that [Ramdath] was in possession of a firearm and had pulled it on Badall in an attempt to shoot Badall" and that "he had no choice but to shoot [Ramdath], in fear of his life." However, comments that he made in his opening and closing statements are not proper evidence. Badall's only testimony on this issue was his statement, in response to the Durgapersads' counsel's question, that he shot Ramdath "in self-defense." However, Rukmin testified that, although Ramdath owned a firearm, he was not carrying the weapon on his person on the day of the shooting. Rukmin testified that Ramdath's firearm was in his closet, hidden under blankets so that their grandchildren could not find it. She testified that during the police investigation of

15

the shooting one of the officers asked her about Ramdath's firearm, and Rukmin showed the weapon in the closet to the officer. Neither witness called by Badall offered any testimony in support of his self-defense theory. The jury was free to disregard Badall's testimony and to credit that of Rukmin. We cannot say the evidence is so contrary to the weight of the evidence as to render the verdict unjust. *See Jackson*, 116 S.W.3d at 761.

Badall also argues that he established his affirmative defense of "assumption of the risk" pursuant to Civil Practice and Remedies Code section 93.001(a)(1). Section 93.001(a)(1) provides that "[i]t is an affirmative defense to a civil action for damages for personal injury or death that the plaintiff, at the time the cause of action arose," was "committing a felony, for which the plaintiff has been finally convicted, that was the sole cause of the damages sustained by the plaintiff." TEX. CIV. PRAC. & REM. CODE ANN. § 93.001(a)(1) (Vernon 2011). However, Ramdath was never charged with or convicted of any felony for his actions at the time this cause of action arose, and, thus, this provision may not be used as an affirmative defense in this case. *See Dugger v. Arredondo*, 408 S.W.3d 825, 834 (Tex. 2013).

Badall contends that "the 'felony, for which the plaintiff has been finally convicted,' language in section 93.001(a) should not apply in a situation where the decedent dies so as to preclude a final conviction so as to bar application of the affirmative defense set out in Chapter 93." We construe this as an argument that

16

the common law unlawful acts doctrine ought to apply to his case. The Texas Supreme Court has rejected this argument, holding that the common law unlawful acts doctrine is not available as an affirmative defense in personal injury and wrongful death cases. *Id.* at 835–36 (observing that legislature abrogated common law defenses such as unlawful acts and assumption of the risk in Civil Practice and Remedies Code Chapter 33 and that section 93.001 reflects legislative intent to "resurrect only a small portion of the unlawful acts doctrine").

We overrule Badall's first issue.

## C. Evidence Supporting Damages Award

Badall attacks various portions of the jury's damages award. We address each in turn.

### 1. *Damages awarded to Ramdath's Estate*

Badall first argues that the award of damages to Ramdath's Estate for $100,000 for pain and mental anguish suffered by Ramdath before he died and $3,000 for burial expenses was improper because the Durgapersads did not assert a claim under the Survival Act statute in any of their pleadings.

However, the Durgapersads' amended petition, which was the live pleading at the time of trial, stated that Rukmin brought the action "individually and in her capacity as Administratrix of the Estate of Ramdath Durgapersad, the decedent." The amended petition further stated that, "[a]s a result of [Badall's] wrongful

17

conduct which led to [Ramdath's death], [Ramdath] endured significant conscious pain and suffering before his expiration on January 9, 2004; and Plaintiffs suffered damages, including, but not limited to, pecuniary and statutory damages as well as compensation for the pain and suffering endured by [Ramdath] prior to his death." The Durgapersads also specifically sought past medical bills and funeral expenses in the amount of $35,000, and they sought $100,000 as damages for pain and suffering.

A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases her claim. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 897 (Tex. 2000). The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense. *Id.* Here, where the amended petition clearly stated that it was filed, in part, on behalf of Ramdath's Estate and alleged facts indicating a claim asserted on Ramdath's behalf for injuries suffered before his death, the Durgapersads satisfied this standard. *See id.* (holding that pleading was sufficient even though it referred to incorrect version of statute).

Furthermore, Badall failed to specially except to the Durgapersads' failure to cite the survival statute as a basis for a cause of action. When a party fails to specially except, courts should construe the pleadings liberally in favor of the pleader. *Id.* (stating that opposing party should use special exceptions to identify

18

defects in pleading so that they may be cured, if possible, by amendment). Because we must construe the Durgapersads' pleadings in their favor, and because they pleaded information specific enough to provide Badall with notice of their intent to pursue claims on behalf of Ramdath's Estate, we conclude the pleadings were sufficient. We reject Badall's arguments on this issue.

### 2. *Amount of Damages*

Badall argues generally that the evidence is "legally and/or factually insufficient to sustain the jury's damage [award] of $753,885.50" because the Durgapersads "presented their case solely on the testimony of Mrs. Rukmin Durgapersad" and Rukmin did not introduce any supporting evidence or documentation regarding the amount of damages incurred by the various parties. He complains specifically of the amounts awarded to Rukmin and her daughters for pecuniary loss, loss of society and companionship, and mental anguish.

#### (a) *Pecuniary Loss*

The jury awarded Rukmin $132,000 for past and future pecuniary loss, and it awarded each daughter $18,000 for past pecuniary loss. The elements of pecuniary damages in the wrongful-death context consist of more than just the lost earning capacity of the decedent—they include also the value of advice, counsel, services, care, maintenance, and support of the deceased. *Moore v. Lillebo*, 722 S.W.2d 683, 687 (Tex. 1986); *Best Steel Bldgs., Inc. v. Hardin*, 553 S.W.2d 122,

19

133 (Tex. Civ. App.—Tyler 1977, writ ref'd n.r.e.). Thus, "[p]ecuniary loss in a wrongful-death case is not subject to precise mathematical calculation, and the jury is given significant discretion in determining this element of damages." *Christus Health v. Dorriety*, 345 S.W.3d 104, 113 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). Pecuniary losses may be recovered even in the absence of specific evidence of the amount of contributions being made by the deceased before his death or that he would have continued to contribute in the future. *Id.*; *see also John Deere Co. v. May*, 773 S.W.2d 369, 379–80 (Tex. App.—Waco 1989, writ denied) (upholding award of pecuniary loss damages to minor daughter for death of her father despite absence of testimony placing specific monetary value on his parental services). Thus, while the amount of damages awarded must be supported by evidence, a jury determining pecuniary loss may look beyond evidence of calculable financial contributions. *See Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996) (holding that there must be evidence of existence and amount of damages); *Dorriety*, 345 S.W.3d at 113 (discussing evidence required to support award of pecuniary loss damages in wrongful-death case).

Here, the unobjected-to charge defined pecuniary loss as "the loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, excluding loss of inheritance." *See Osterberg*, 12 S.W.3d at 55 (holding that we review sufficiency of evidence in light of legal standards

20

contained in unobjected-to charge). Jurors may apply their knowledge and experience to estimate the value of services, such as household services, rendered by a decedent, without proof of their value. *Excel Corp. v. McDonald*, 223 S.W.3d 506, 510 (Tex. App.—Amarillo 2006, pet. denied) (citing *Mo.-Kan.-Tex. R.R. Co. v. Pierce*, 519 S.W.2d 157, 160 (Tex. Civ. App.—Austin 1975, writ ref'd n.r.e.)). Likewise, "[a] parent's services to a child, such as nurture, care, education, and guidance, have a monetary value in addition to any financial contributions." *Samco Props., Inc. v. Cheatham*, 977 S.W.2d 469, 480 (Tex. App.—Houston [14th Dist.] 1998, pet. denied).

Rukmin testified that Ramdath "did everything for [Susan]" up until the time of his death, including paying her way through dental school and buying her books. Ramdath also paid for Rekha to attend LSU and provided support, including financial support, advice, and counsel to all three of his daughters. Rukmin testified that she had retired, that Ramdath "provided everything" for her, and that it was difficult for her to continue to meet her financial burdens, such as providing money to her children and meeting living expenses, after Ramdath's death. Rukmin had to learn "everything the hard way," including learning how to run the tire shop after Ramdath's death. We conclude that this is legally sufficient evidence to support the jury's award of pecuniary damages. *See City of Keller*, 168 S.W.3d at 810.

21

Badall argues that the Durgapersads failed to present any documentary evidence supporting the award of damages. However, such evidence is not always required. *See Dorriety*, 345 S.W.3d at 113; *see also Cheatham*, 977 S.W.2d at 480 ("[M]easuring a beneficiary's pecuniary loss is inherently speculative and imprecise and is therefore best left to the jury's common sense and sound discretion."). Furthermore, the jury was entitled to apply its own knowledge and experience to estimate the value of the services Ramdath provided to his daughters, such as aiding them in their educational endeavors and providing them with vehicles and other financial support appropriate to young adults. *See McDonald*, 223 S.W.3d at 510; *Cheatham*, 977 S.W.2d at 480. The jury awarded each daughter $18,000 as "the loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value" that Ramdath would likely have made to each over the time between his death in January 2004 and trial in June 2013. That means that the jury determined that Ramdath would have provided approximately $2,000 worth of care, maintenance, and support to each daughter per year for the nine years following his death. Likewise, the jury determined that Ramdath's "care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value" to his wife, Rukmin, in both their business and their personal life would have totaled $7,333 per year between the time of his death and the time of trial and $66,000 for Rukmin's future. *See*

*also McDonald*, 223 S.W.3d at 510 (holding that jurors may apply their knowledge and experience to estimate value of services, such as household services, rendered by decedent without proof of their value); *Cheatham*, 977 S.W.2d at 480 (holding that services such as nurture, care, and guidance have monetary value in addition to any financial contribution).

Badall did not present any evidence rebutting Rukmin's testimony. We conclude, after considering and weighing all of the evidence, that the jury's award of $132,000 to Rukmin for past and future pecuniary loss and its award of $18,000 for past pecuniary loss to each daughter is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Jackson*, 116 S.W.3d at 761.

### (b) Loss of Companionship and Society

The jury also awarded Rukmin $105,000 and each daughter $30,000 for past and future loss of companionship and society. The jury charge defined "loss of companionship and society" as "the loss of the positive benefits flowing from the love, comfort, companionship, and society that [the Durgapersads], in reasonable probability, would have received from Ramdath Durgapersad had he lived." *See Thomas v. Uzoka*, 290 S.W.3d 437, 455 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (defining loss of companionship and society as referring to "the positive benefits flowing from the love, comfort, companionship, and society that

the beneficiary would have experience had the decedent lived"). "As compared with mental anguish, which emphasizes the *negative* impact of the wrongful death on the beneficiary, loss of companionship and society focuses on the removal of *positive* benefits that the beneficiary once enjoyed but which were taken away by the wrongful death." *Id.* at 455–56 (emphasis in original) (citing *Moore*, 722 S.W.2d at 688). Although mental anguish is distinguishable from loss of companionship and society, in awarding damages for both elements, the jury may consider some of the same factors. *Id.* at 456 (identifying factors to be considered as including relationship between decedent and beneficiary, living arrangements of parties, any extended absence of deceased from beneficiary, harmony of family relations, and parties' common interests and activities).

Rukmin testified that their family was close and loving. They took a family trip to Trinidad in July before Ramdath was murdered, and the family was together for Christmas just weeks before Ramdath's death. She testified that she and Ramdath and various children would take trips to the Gulf of Mexico to fish and that they all spoke on the phone regularly. She testified that their only son, Ragis, had a heart attack and died at the age of thirty-three on the first day of the murder trial, leaving behind two children. She also testified that Susan and Reshma both had children whom Ramdath never got to meet because of his untimely death. Rukmin also testified that Ramdath did not get to see Susan graduate from dental

school or Rekha graduate from LSU. Rukmin testified that all of the children missed their father and that they missed the advice and counsel that he had always given them.

Rukmin testified that for most of the six years preceding Ramdath's murder she had worked in Louisiana, where Rekha was in school, while Ramdath lived in Texas and ran the tire shop. However, she also testified that she came home every weekend to cook and clean for him and that she had just retired a few months before Ramdath's murder to spend all of her time with him.

We conclude that the evidence is legally sufficient to support the jury's award of damages for "loss of companionship and society," and we conclude that the award of $105,000 to Rukmin and $30,000 to each daughter does not weigh against the great weight and preponderance of the evidence. *See City of Keller*, 168 S.W.3d at 810; *Jackson*, 116 S.W.3d at 761; *see also Thomas*, 290 S.W.3d at 456 (holding that award to wife of cab driver killed in collision of $550,000 for past and future loss of companionship and society and $150,000 for mental anguish was not "so against the great weight a preponderance of the evidence that it is manifestly unjust, shocks the conscience, or clearly demonstrates the existence of bias").

*(c) Mental Anguish*

The jury awarded Rukmin $41,250 and each daughter $11,250 for past and future mental anguish, which was defined as "the emotional pain, torment, and suffering experienced by [the Durgapersads] because of the death of Ramdath Durgapersad." To support an award of mental anguish, a party must present either direct evidence of the nature, duration, and severity of her mental anguish, thereby establishing a substantial interruption in her daily routine, or circumstantial evidence of a high degree of mental pain and distress that is greater in degree than mere worry, anxiety, vexation, embarrassment, or anger. *See Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 231 (Tex. 2011); *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). Thus, proof of mental anguish can include painful emotions such as grief, severe disappointment, indignation, wounded pride, shame, despair, public humiliation, or a combination of any or all of those feelings. *Thomas*, 290 S.W.3d at 455.

Here, Rukmin testified that she had suffered a heart attack because of the stress of her husband's murder and that she was taking medication for stress. She further testified that she was in and out of the hospital and doctor's offices. She testified that she could not sleep well and that she did not like to have any pictures or reminders of what her family was like before Ramdath died. Rukmin testified that her son, Ragis, died of a heart attack at age thirty-three on the first day of

26

Badall's murder trial. She further testified that her daughter Reshma went into labor the day that Ramdath died and, as a result, was not able to come to Ramdath's funeral. She testified that Susan still had not given up Ramdath's name, even though she had married, because she does not want to give up her maiden name. Susan also has three children that Ramdath was never able to meet due to his untimely death. Rukmin also testified that Rekha took Ramdath's death very hard and that it "almost took her life." Rekha took a break from her studies at LSU while she mourned the loss of her father. Rukmin testified that they all suffered because of Ramdath's murder and "still do."

We conclude that this is evidence of substantial interruption in the daily routines of the Durgapersads as a result of Ramdath's murder and that they presented evidence of mental pain and distress that is greater in degree than mere worry, anxiety, vexation, embarrassment, or anger. *See Guerra*, 348 S.W.3d at 231; *Woodruff*, 901 S.W.2d at 444. Thus, the jury's award of mental anguish damages totaling $41,250 to Rukmin and $11,250 to each daughter was supported by legally and factually sufficient evidence. *See Sanchez v. Schindler*, 651 S.W.2d 249, 250–53 (Tex. 1983) (upholding mental anguish award of $102,500 to mother of child killed in collision with pick-up truck, stating, "The destruction of the parent-child relationship results in mental anguish, and it would be unrealistic to separate the injury to the familial relationship from emotional injury"); *Thomas*,

27

290 S.W.3d at 455–56 (upholding mental anguish award of $150,000 as well as awards totaling $550,000 for past and future loss of companionship and society to wife of cab driver killed in collision where wife "testified at some length" about relationship she shared with husband and impact of his death on her, including plans they had made for future).

We overrule Badall's second issue.

### Evidentiary Complaints

In his third and fourth issues, Badall challenges the trial court's ruling excluding certain evidence.

### A. Standard of Review

We review a trial court's admission or exclusion of evidence for an abuse of discretion. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding principles. *Bowden v. Philips Petroleum Co.*, 247 S.W.3d 690, 696 (Tex. 2008). We will not reverse a trial court for an erroneous evidentiary ruling unless the error probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1; *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004). To preserve error concerning the exclusion of evidence, a party must, among other steps, actually offer the evidence, state the purpose for which the evidence is offered, give the trial court reasons why

the evidence is admissible, and obtain an adverse ruling. *See Comiskey v. FH Partners, LLC*, 373 S.W.3d 620, 629–30 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); *Rhey v. Redic*, 408 S.W.3d 440, 458 (Tex. App.—El Paso 2013, no pet.); *see also* TEX. R. APP. P. 33.1 (requiring, to preserve error, timely request that "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context").

## B. Evidence of Settlement Agreement

In his third issue, Badall argues that the trial court erroneously excluded evidence of the Durgapersads' settlement agreement with St. Elizabeth Hospital. He identifies the following exchange as presenting reversible error:

[Badall]: Ms. Durgapersad, do you know of any other reason why your husband may have died besides the injury from the gunshot wound?

. . . .

[Rukmin]: No. He died from the gunshot wound. No other reason.

[Badall]: Do you have any knowledge whether or not any allegation was made against—

[counsel]: Objection, Your Honor. He's trying to bring in anything that there is absolutely no evidence of in this trial. I would object as to irrelevant as well as potentially prejudicial.

[Court]: I will let him ask the question. . . .

29

[Badall]: Do you have any knowledge whether or not any allegation was made against certain medical personnel of St. Elizabeth Hospital?

[Rukmin]: No.

[Badall]: That your husband's death was caused by improper medical treatment by medical personnel of this hospital?

[counsel]: Objection, Your Honor. Same objection. There has been no evidence whatsoever of this. [I]t's irrelevant first of all; and second there is no evidence of it.

. . . .

[court]: Objection is overruled. You can answer.

[Badall]: Do you know what medical personnel was allegedly responsible for your husband's death?

. . . .

[Rukmin]: No.

[Badall]: Do you know what improper medical treatment that was performed that caused your husband's death?

[counsel]: Your Honor, same objection. He's assuming facts not in evidence.

[Court]: Sustained.

[Badall]: Did anyone with St. Elizabeth Hospital provide you with a settlement in regard to the death of your husband?

[counsel]: Objection, Your Honor. It's irrelevant to this case.

[Court]: Sustained.

Badall argues, first, that the Durgapersads failed to provide any information about their settlement with the hospital during discovery. However, he did not

30

present this argument to the trial court. Thus, this complaint is waived. *See* TEX. R. APP. P. 33.1; *U. Lawrence Boze' & Assocs., P.C. v. Harris Cnty. Appraisal Dist.*, 368 S.W.3d 17, 32 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (holding that to preserve error on discovery dispute, appealing party must obtain ruling by trial court on discovery issue).

Badall also argues that "the record is clear [that] [Rukmin] was well aware of other reasons that led to her husband's death and did not want the jury to become aware of the fact that she collected a substantial amount of money from St. Elizabeth Hospital, as part of a settlement agreement for causing her husband's death." However, the record demonstrates only that Rukmin did not know of any other negligence besides Badall's that caused Ramdath's death, nor did she know of any claims that she or anyone else had made on behalf of Ramdath's Estate. Badall did not present to the trial court a settlement agreement or any evidence of the existence of a settlement agreement between any of the Durgapersads and the hospital. Thus, we conclude that Badall did not preserve his complaint that the trial court improperly excluded evidence of a settlement agreement. *See* TEX. R. APP. P. 33.1; *Comiskey*, 373 S.W.3d at 629–30; *Rhey*, 408 S.W.3d at 458.

We overrule Badall's third issue.

## C.        Impeachment Evidence

In his fourth issue, Badall argues that the trial court erred in ruling that he could not offer certain impeachment evidence against Rukmin. Rukmin testified that she did not see Ramdath with a weapon on his person on the day he was murdered, and Badall attempted to impeach her, apparently by referring to the prior criminal proceedings and arguing that she "testified under oath in a jury trial that [she saw] her husband with a handgun coming from the bedroom on that day. It is in the transcript, ma'am." The trial court interjected, "Hold on a second. Mr. Badall, there are proper procedures. If you're attempting to impeach this witness, there are proper procedures. I would suggest you follow the correct procedure." Badall "request[ed] to have the video statement to be shown in court today." However, Badall never produced the video statement.

Badall argues that he should have been permitted to introduce Rukmin's video-recorded statement for impeachment purposes. However, he has not clearly identified which video-recorded statement he is referring to, and he produced no such statement to be considered by the trial court. Thus, we conclude that Badall did not preserve his complaint that the trial court improperly excluded evidence of the video-recorded statement that allegedly would have impeached Rukmin's testimony. *See* TEX. R. APP. P. 33.1; *Comiskey*, 373 S.W.3d at 629–30; *Rhey*, 408 S.W.3d at 458.

We overrule Badall's fourth issue.

## Dismissal for Want of Prosecution

In his fifth issue, Badall argues that the trial court erred in reinstating the case and failing to dismiss it for want of prosecution. He argues that, "although [he] made requests for dismissal for want of prosecution, the court allowed the suit to remain pending from January 6, 2006, to June 11, 2013, not only causing [him] to lose contact with defense witness(es), but also causing the interest calculation rate to be unreasonable and excessive."

We review a trial court's ruling on a motion to reinstate under Rule of Civil Procedure 165a for an abuse of discretion. *Smith v. Babcock & Wilcox Constr. Co.*, 913 S.W.2d 467, 468 (Tex. 1995) (per curiam). Rule 165a provides that a "court shall reinstate the case upon finding after a hearing that the failure of the party or his attorney was not intentional or the result of conscious indifference but was due to an accident or mistake or that the failure has been otherwise reasonably explained." TEX. R. CIV. P. 165a(3).

The trial court dismissed the case for want of prosecution when the Durgapersads failed to appear at the March 14, 2011 trial setting. However, the Durgapersads moved for reinstatement, asserting that their failure to appear was not intentional or the result of conscious indifference. They asserted that it was the result of a miscommunication with the trial court's clerk, who, they argued, told

33

them that the trial had been reset. They supported their motion to reinstate with a printout from the trial court's webpage showing a trial setting in April 2011.

Furthermore, we observe that many of the delays in this case were beyond the control of the Durgapersads or the trial court. The case was filed in 2006, but Badall's criminal conviction did not become final until 2007 when the Court of Criminal Appeals refused his petition for discretionary review. The Durgapersads then obtained a final summary judgment that was appealed to the Ninth Court of Appeals. The case was remanded for a new trial in 2009.

We conclude that the trial court acted within its discretion by finding that the Durgapersads' explanation for why they failed to appear was not due to conscious indifference. We further conclude that the trial court did not abuse its discretion in denying Badall's subsequent motions to dismiss pursuant to Rule 165a.

We overrule Badall's fifth issue.

## Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.