**Concurring In Part and Dissenting In Part; Opinion Filed November 30, 2020**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-18-00167-CV**

**SARAH GREGORY AND NEW PRIME, INC., Appellants**
**V.**
**JASWINDER CHOHAN, INDIVIDUALLY AND AS NEXT FRIEND AND NATURAL MOTHER OF G.K.D., H.S.D., AND A.D., MINORS, AND AS REPRESENTATIVE OF THE ESTATE OF BHUPINDER SINGH DEOL, DARSHAN SINGH DEOL, JAGTAR KAUR DEOL, GUILLERMO VASQUEZ, WILLIAM VASQUEZ, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF ALMA B. ("BELINDA") VASQUEZ, ALMA J. PERALES, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF HECTOR PERALES AND AS NEXT FRIEND OF MINOR N.P., Appellees**

**On Appeal from the County Court at Law No. 5**
**Dallas County, Texas**
**Trial Court Cause No. CC-15-02925-E**

# OPINION CONCURRING IN PART AND DISSENTING IN PART TO THE COURT'S OPINION

Before the Court sitting En Banc

Concurring and Dissenting Opinion by Justice Schenck

I join Parts I through VII and IX of the majority opinion that I drafted as the panel opinion prior to the Court deciding to consider this case en banc. However, I respectfully dissent from Part VIII of the majority opinion in which the majority

resolves Gregory and New Prime's challenge of the non-economic damages awarded to the Deol family members because, in doing so, the majority misapplies, or wholly fails to apply, the factual sufficiency standard of review. More particularly, the majority fails to conduct a "meaningful evidentiary review" of the mental anguish and loss of companionship damage awards as required by Texas Supreme Court precedent. *See Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996).

## I.

To summarize, I differ from the majority in the standards that govern the amount of mental anguish awards in a case such as this where (1) there has been no effort to present evidence augmented by proper legal argument or admissible opinion testimony that would direct the factfinder to a "fair and reasonable" number and (2) there has been obviously improper argument urging the jury to disregard the compensatory purpose of its award in order to "send a message" with its number. As I indicated in what is now the majority opinion, while it is a close question, I do not believe that this improper argument mandates reversal on its own account. Instead, I believe we are obliged to look for other evidentiary support for the award and to affirm the award if, using the proper burden of proof and standards of review, we can do so. That obligation requires us to examine both legal and factual sufficiency and, I believe, permits us to employ objective measures, including

looking to awards in like cases *both* to support[1] the award and to assess potential excessiveness.

In my view, the majority misses the mark by affirming the awards simply because the jury heard Jaswinder Chohan's testimony concerning the family members' relationships with Deol and that they are understandably deeply saddened by his death. I agree that this evidence is sufficient to establish the fact of the emotional injury and the entitlement to pursue *some* amount of damages; it is not, however, also *a priori* assumption that the evidence is factually sufficient to support the award of any amount that would not "shock the judicial conscience," whatever that might mean. Conflating evidence of the existence of an injury with its quantification ignores that two distinct and critical questions are involved in the trial court, as the Texas Supreme Court has repeatedly stressed. *See, e.g.*, *id.* Likewise, deferring to *any* number so derived so long as it does not "shock the conscience" is not the "meaningful" evidentiary review the supreme court has insisted upon in these cases. It is, instead, a retrenchment to the rejected doctrine that such awards are inherently arbitrary, leaving both the claim and the resulting award needlessly open to attacks, such as the due process claim Gregory and New Prime raise here. Instead, I believe that we can, and should, strive to apply more objective and manageable

---

[1] While cases have typically looked at like awards for proof of excessiveness, if we are to conclude that proof of a close familial relation is enough to presume some mental injury to avoid a legal insufficiency challenge, like cases might also be relevant to determine whether the jury was within its lawful discretion in choosing a particular amount.

standards at both the trial and appellate levels that the supreme court has recognized and applied over the past decades.

Insofar as *legal* sufficiency is concerned, I believe that the Texas Supreme Court's decision in *Moore v. Lillebo* supports the argument that evidence of a *close* familial bond is sufficient in its own right to support the existence of some compensable injury, if not its amount. 722 S.W.2d 683, 685 (Tex. 1986).[2] As a result, barring any further evidence of the amount, we would be obliged to avoid a reversal and rendition and should, instead, move on to consider *factual* sufficiency, which Gregory and New Prime also challenge.

But, as to factual sufficiency, the evidence at trial must be tied in some non-arbitrary fashion to the jury's award, and our review of it must be "meaningful." *Saenz*, 925 S.W.2d at 614. This is not only a plain directive by *Saenz* and other controlling cases, I believe it is essential to the continued recognition of the claim as against modern due process standards or a re-evaluation of the common law that initially refused to recognize it for the reasons I articulate herein. Arguments to the effect the jury "heard the evidence" and received a written charge warning against passion is a truism in this and every other case. If countenanced as enough in its

---

[2] I concede that *Moore* is neither recent nor as clear as one might like in this respect, as Justice Whitehill observes. As discussed below, if I read *Moore* correctly, I believe a better alternative may be to accept it as not only embracing proof of *some* amount of damage, but an amount up to a presumed floor in keeping with more broadly acknowledged understanding of the presumed injury. What I do not accept as consistent with *Saenz* and its progeny or the due process clause is that proof of *any* injury translates into adequate proof of *any* amount.

own right this would amount to allowing the jury to "pick a number and put it in the blank," something it is not permitted to do. *Id.* Accepting the number so yielded by that process, with the declaration that our "conscience" is not "shocked," affords no review. Worse, the complete lack of articulable, objective standards makes it impossible for parties to mediate their claims in advance of trial or direct their arguments in a court and further subjects the claim to broader attack.

## II.

I believe an historical overview of mental anguish damages and loss of companionship damages in wrongful death cases is helpful in understanding the current state of the law in this area. Historically, courts distrusted claims of mental anguish or mental suffering. *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 442 (Tex. 1995). In fact, at first, the common law, in Texas and elsewhere, refused to acknowledge mental or emotional harm as a compensable loss at all. *Lynch v. Knight*, 11 Eng. Rep. 854, 863 (1861). It did so because mental anguish is inherently subjective and claims of mental anguish do not readily lend themselves to judicial management to avoid arbitrary deprivations of the answering defendant's rights. *See, e.g.*, *Parkway*, 901 S.W.2d at 442.

Nevertheless, over time, in keeping with growing empirical and scientific proof, courts came to recognize mental anguish as not only a real phenomenon but as a legally cognizable damage in its own right, crafting exceptions to the categorical ban on recovery along the way. *Id.* Acknowledging that the existence of mental

anguish is less readily verifiable than other, physical injuries, mental anguish damages were initially limited to cases in which there was a physical injury. *See Hill v. Kimball*, 13 S.W. 59, 59 (Tex. 1890). Then, compensation for mental anguish unaccompanied by a physical impact injury was allowed provided the mental anguish had "a physical manifestation." *See id.*; *see also Gulf, C. & S.F. Ry. Co. v. Hayter*, 54 S.W. 944, 945 (Tex. 1900). The physical impact rule was eased further with the Texas Supreme Court adopting the "zone of danger" theory of bystander recovery from *Dillon v. Legg*.[3]

Eventually, the requirement of an actual physical injury or near injury was abandoned at common law in this narrow, statutory setting to allow wrongful death claimants to recover mental anguish damages without any physical injury or proximity to the events, though initially only on behalf of a parent for the loss of a minor child. *See Freeman v. City of Pasadena*, 744 S.W.2d 923, 923–24 (Tex. 1988); *Sanchez v. Schindler*, 651 S.W.2d 249, 253 (Tex. 1983).[4]

I fear that we may forget too easily how close and controversial these latter decisions were. *E.g.*, *Sanchez*, 651 S.W.2d at 253 (Pope, C.J., dissenting joined by McGee and Barrow, JJ.). And, likewise, how important the subsequent supreme

---

[3] *Dillon v. Legg*, 441 P.2d 912, 920 (Cal. 1968).

[4] At the same time the Texas Supreme Court abolished the ban on mental anguish damages in wrongful death cases, it also acknowledged loss of companionship damages in wrongful death cases. *See Sanchez*, 651 S.W.2d at 253.

–6–

court decisions concerning the need for objective standards and meaningful review are to sustaining a claim for a loss virtually every human will sustain during his or her life. To this day, other jurisdictions as progressive and enlightened as our own have engaged in the same experiential exercise of refining common law rules and have found the risk of "unmanageable" and totally "unpredictable liability" to outweigh the benefit of recognizing the claim at all in a variety of settings. *See, e.g.*, *Guia v. Arakaki*, 99 P.3d 1068 (Haw. 2004).

In the decades before *Sanchez,* our own supreme court declined to recognize any claim of emotional distress absent physical impact, no matter how real the injury was, and left the matter to the legislature, expressing the concern that it would "open a wide and dangerous field in which it is difficult, if not impossible, to consistently apply the rule." *Harned v. E-Z Fin. Co.*, 254 S.W.2d 81, 86 (Tex. 1953). *Sanchez* set us on a different and difficult path. Yet, *Saenz* insists that it does not impose an impossible task. I believe that we can, and must, enforce some standards that do not reopen the claim to the charge that it is inconsistently applied and unpredictable if the experiment is to survive.

### III.

A. **Proof of the Existence of Mental Anguish Is Distinct From Proof Quantifying Its Extent**

In 1995, the Texas Supreme Court set forth the specific type of evidence a claimant must present to establish the *existence* of compensable mental anguish.

*Parkway*, 901 S.W.2d at 444. More particularly, the supreme court stated mental anguish damages could not be awarded unless there was (1) direct evidence of the nature, duration, or severity of the plaintiff's anguish, thus establishing a substantial disruption in the plaintiff's daily routine or (2) other evidence showing that the plaintiff suffered from a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Id.* Evidence of the *existence* of a compensable injury is not simultaneously evidence of its *quantum.* Were it otherwise, the notion of nominal damages would not exist. *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 665 (Tex. 2009). Because such nominal damage awards obviously fail to compensate for an established injury, we rightly resist resort to them. *Id.* at 666. We generally ask, instead, whether the party with the burden of proving the amount has brought "forward the best evidence of the damage of which the situation admits." *Id.* (quoting *Gulf Coast Inv. Corp. v. Rothman*, 506 S.W.2d 856, 858 (Tex. 1974)). We are willing to affix the label of "actual damages" to damages that are *actually* shown by that best evidence if it "affords a reasonable basis for estimating [the] loss." *Gulf Coast Inv.*, 506 S.W.2d at 858. "Application of the rule" has never meant "that a guess or surmise on the part of the jury would suffice." *Id.* Earlier efforts to suggest that emotional awards are inherently arbitrary and somehow exempt from this requirement have already been rejected. *Saenz*, 925 S.W.2d at 614 ("[W]e disagree with the court of appeals that translating mental anguish into dollars is a necessarily arbitrary process.").

Rather, to support an award of mental anguish damages, "[t]here must be both [1] evidence of the *existence* of compensable mental anguish and [2] *evidence to justify the amount awarded.*" *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013) (emphasis and enumeration added).

Here, Gregory and New Prime concede that the members of the Deol family suffered mental anguish as a result of Deol's death. On appeal, they challenge the legal and factual sufficiency of the evidence to justify the amounts awarded.[5] They contend that the closing argument adopted by Deol's counsel urged jurors to punish, rather than compensate, for the injury. I note that the resulting award is quite close to the "amount" so urged. Putting that problem aside for the moment, the evidence before the jury, as I will detail below, showed a close familial relation of a type sufficient, in my view, to support entitlement to some award and to overcome a legal sufficiency bar and the resulting rendition of an adverse judgment. Thus, I would overrule Gregory and New Prime's legal sufficiency challenge of the mental anguish damages awarded to the Deol family members and proceed to a factual sufficiency review.

While the jury heard about a close familial relation, the jury did not hear any evidence of, among other things, the likely duration of the Deol family members'

---

[5] More particularly, in their supplemental briefing to the Court, Gregory and New Prime clarified that they are claiming the evidence is legally and factually insufficient to support any award for future mental anguish and is factually insufficient to support the awards for past mental anguish and past and future loss of companionship.

mental anguish or the need for therapy or other treatment or its costs. It did not have evidence or guidance, in the form of expert opinion or otherwise, concerning whether, among other things, their emotional distress had resulted or might result in a material diminution in quality of life or functioning, a propensity for alcohol or drug abuse, a disruption of relationships, or their ability to seek or hold employment. *See, e.g.*, *Atchison, Topeka & Santa Fe Ry. v. Cruz*, 9 S.W.3d 173, 184–85 (Tex. App.—El Paso 1999, pet. granted, judgm't vacated, remanded by agr.) (appellees' economist gave the jury guidelines in how damages for intangible elements could be calculated). The jury's attempt to affix a number in this case was not only misinformed by improper argument, it was little more than guesswork that would be applicable to any case involving the loss of a close family member. I accept that some real loss occurs in every such case and readily accept that some damages can be presumed to follow. But, if *any* number could be upheld as *factually* sufficient on this showing, we would move back to the position explicitly rejected in *Saenz,* making the process "necessarily arbitrary" and compelling us to accept virtually any damage figure in any wrongful death case.

**B.    Common Law Standards**

I note that in the 30-plus years since the Texas Supreme Court first recognized mental anguish damages in wrongful death cases, and in the years since the supreme court handed down *Saenz*, with notable exceptions, the high court has given the intermediate appellate courts little guidance to govern its mandate that courts of

appeals, as the sole appellate courts addressing factual sufficiency of non-economic damages, conduct a "meaningful review" of them.[6]

While the majority appears to adhere to prior panel precedent dismissing a comparison of the award in one case to any other like cases as "generally of little or no help," *see U-Haul Int'l, Inc. v. Waldrip*, 322 S.W.3d 821, 855–56 (Tex. App.—Dallas 2010), *aff'd in part, rev'd in part on other grounds*, 380 S.W.3d 811 (Tex. 2012), I disagree. *See Bill Hendrix Auto Parts v. Blackburn*, 433 S.W.2d 237 (Tex. App.—Houston [14th Dist.] 1968, no writ).[7] The supreme court has recently confirmed that this comparison to like cases is entirely proper. *See Anderson v. Durant*, 550 S.W.3d 605, 620 (Tex. 2018). Indeed, at this stage, it appears to be the only expressly approved vehicle we have for lending some measure of objectivity and predictability to mental anguish awards in wrongful death cases. The only other like metric available in other contexts—the ratio between economic and non-economic damages—is ill-suited to this claim because it is brought by the surviving family members, not the decedent whose primary economic loss is captured in a separate claim.

---

[6] Claims for non-economic damages suffer the same infirmities as claims of partisan gerrymandering, which the United States Supreme Court has refrained from addressing because the Constitution contains no legal standards for resolving such claims and are thus not subject to judicial management. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2499 (2019).

[7] *See also Emerson Elec. v. Johnson*, 601 S.W.3d 813, 845 (Tex. App.—Fort Worth 2018, pet. granted).

Before I briefly note the other strategies developed for judicial management of these awards, I will note that the United State Supreme Court began its foray into the proper due-process-compelled review standards for punitive damages by comparison to the broad discretion juries had in affixing a proper number to compensate for emotional distress. *Pac. Mut. Life Ins. V. Haslip*, 499 U.S. 1, 20 (1991). Critical to the court's original determination that Alabama procedures created "a definite and meaningful constraint" on the amounts juries awarded was that Alabama's appellate courts were, at least at that point, thought to be engaged in "meaningful and adequate review" by the trial court followed by appellate review having "real effect." *Id.* at 20–23. Thereafter, it would appear that the United States Supreme Court's confidence that state court appellate review actually provided that meaningful constraint against arbitrary awards slipped. The supreme court, as a matter of federal due process, introduced much firmer constraints deemed necessary to assure that any award is "based upon an 'application of law, rather than a decisionmaker's caprice.'" *E.g.*, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (recounting march toward mandatory 3-prong "guideposts," mandatory *de novo* appellate review) (internal citation omitted).

Other common law jurisdictions have developed other techniques aimed at avoiding arbitrarily excessive awards. As noted, some have simply opted to adhere to our own, pre-1985 common law, banning non-economic damage awards in wrongful death cases. *See, e.g.*, *In re Air Crash at Belle Harbor, N. Y. on Nov. 12,*

*2001*, 450 F. Supp. 2d 432 (S.D.N.Y. 2006) (applying New York law). As modern understanding seems to confirm only that mental anguish in these settings is real, if challenging to quantify, I would find other options to support their recognition to be preferable. Congress,[8] state legislatures,[9] and courts[10] have adopted various limits or caps on non-economic damages to lend some predictability and, in some cases, in response to run-away jury verdicts with the limits typically expressed in the hundreds of thousands of dollars. These provisions sometimes operate not so much as absolute caps but as a limited authorization for presumed damages, much like our own *Moore* decision permits presumption of *some* quantum of harm. Claimants are still required to show harm, and the awards are scrutinized as such, up to the presumed limit. Claimants are also permitted to prove entitlement to additional amounts that would be supported by proof peculiar to the case, such as aggravating conduct by the defendant. In this way, the rule acknowledges the uncertain nature

---

[8] Title VII claimants, for example, are limited in their recovery of emotional distress, regardless of the extent of their injury, depending on the size of the employer, with maximum recovery being limited to $300,000. 42 U.S.C. § 1981a(b)(3).

[9] Many states have imposed hard limits on the recovery of noneconomic damages ranging from $250,000 to $1,000,000. *See* ALASKA STAT. ANN. § 09-17.010(b) ($400,000 wrongful death); CAL. CIV. CODE. ANN. § 3333.2 ($250,000 medical malpractice); COLO. REV. STAT. § 13-21-102.5 (wrongful death $250,000 with inflation adjustment); IDAHO CODE ANN. § 6-1603(4)(1) ($250,000 wrongful death); MASS. GEN. LAWS ch. 231 § 60H ($500,000 medical malpractice); MD. CODE ANN., CTS. & JUD. PROC. § 11-108(b)(2) ($500,000 wrongful death); MISS. CODE ANN. § 11-1-60(2)(6) ($1,000,000 wrongful death); ORE. REV. STAT. § 31.710(1) ($500,000 wrongful death); TENN. CODE ANN. § 29-39-102 ($750,000 wrongful death).

[10] For example, the Supreme Court of Canada, which adheres to the same common law our constitution embraces, adopted a non-economic damages cap with adjustment for inflation–presently just under $400,000. *Andres v. Grand & Toy Alberta Ltd.*, [1978] 2 S.C.R. 229; *Thornton v. District No. 57*, [1978] 2 S.C.R. 267; *Arnold v. Teno*, [1978] 2 S.C.R. 287. The rule permits additional damages on proof of aggravating damages. *McIntyre v. Grigg*, [2006] 83 O.R. 3d 161 (Can. Ont. C.A.).

of the injury while obliging the claimant to adduce more meaningful proof as the claim exceeds the upper limits. *Cf. Addington v. Tex.*, 441 U.S. 418 (1979) (discussing proof standards compelled by due process in relation to extent and nature of the interest involved).

While the Texas Legislature has not adopted any limit or cap on non-economic damages, the Texas Supreme Court is not bound by the prior legislative inaction in an area like tort law, which has traditionally been developed primarily through the judicial process. *Sanchez*, 651 S.W.2d at 252 (citing Green, *Protection of the Family Under Tort Law*, 10 HASTINGS L.J. 237, 245 (1959)). Mental anguish and loss of companionship damages are judicially created remedies, and it is within the supreme court's authority to adapt or refine the common law it created should it conclude that *Saenz* and its progeny have not lent the necessary degree of rigor to these awards since 1996. It is said that the genius of the common law is that it evolves slowly in the light of reason and experience. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 690 (Tex. 1990) (Mauzy, J., concurring); O.W. Holmes, Jr., THE COMMON LAW 273 (1881) ("The life of the law has not been logic; it has been experience.").[11]

In my review of approximately one hundred and fifty cases in which the Texas Supreme Court considered mental anguish damages, in only two of those cases did

---

[11] A limit or cap might be structured to allow the reviewing court, in resolving a factual sufficiency challenge, to defer to the jury's award provided it falls within the evidence and the capped amount. If the award exceeds the cap, the intermediate appellate court would consider whether extraordinary circumstances support a higher award.

the court uphold the damages awarded as supported by legally sufficient evidence. Those awards were of $5,000 and $150,000, respectively in *Bennett v. Grant*, 525 S.W.3d 642 (Tex. 2017), and *Bunton v. Bentley*, 153 S.W.3d 50 (Tex. 2004). While I do not believe that the court's approval of a $150,000 mental anguish award as against *legal* sufficiency challenges would answer the question as a whole, it comes close to like limits in other jurisdictions and should give pause to an intermediate appellate court charged with conducting "meaningful review" of an award in a case, like this, where the jury was operating with little in the way of guidance.

As an intermediate appellate court, our charge is limited to the guidance we have, which at this stage includes only the limited direct evidence and argument offered at trial and comparison to like awards. With that in my mind, I will turn to that task.

## C.     Factual Sufficiency Under *Saenz* and *Anderson*

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak or so contrary to the overwhelming weight of all the evidence that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). Whether damages are excessive and whether a remittitur is appropriate is a factual determination that is final in the court of appeals. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407

(Tex. 1998); *see also* TEX. CONST. art. V, § 6; TEX. GOV'T CODE ANN. § 22.225(a).

The nebulous issues of mental anguish and loss of companionship are "inherently somewhat imprecise." *Thomas v. Uzoka*, 290 S.W.3d 437, 454 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). Because these damages are unliquidated and incapable of precise mathematical calculation, once the existence of non-economic loss is established, the jury is given significant discretion in fixing the amount of the award. *Id.* Yet, at the same time, a factual sufficiency review ensures that the evidence supports the jury's award; and, although difficult, the law *requires* appellate courts to conduct a "meaningful" factual sufficiency review of a jury's nonpecuniary damages award in a wrongful death case. *Hawkins v. Walker*, 238 S.W.3d 517, 531 (Tex. App.—Beaumont 2007, no pet.) (citing *Saenz*, 925 S.W.2d at 614)).[12] Thus, while a jury has latitude in assessing intangible damages in wrongful death cases, its damage awards do not escape the scrutiny of appellate review. *See Saenz*, 925 S.W.2d at 614. Merely establishing the existence of compensable mental anguish is not enough. *Id.* There must be evidence that the *amount* found is a fair and reasonable compensation, just as there must be evidence to support any other jury finding. *Id.* Juries are not permitted "to pick a number and

---

[12] I note that while our sister court of appeals considered the *Saenz* dictate of a "meaningful review" to apply to the review of loss of companionship damages, the Texas Supreme Court has not yet expressly stated as much. Nevertheless, in *Bennett v. Grant*, the court signaled application of the meaningful review to non-economic damages generally. 525 S.W.3d 642, 648 (Tex. 2017). For purposes of this dissent, given the nature of both mental anguish and loss of companionship damages, I find it appropriate to apply the same standard of review.

put it in the blank." *Id.*

## 1. The Awards in This Case

In this case, the jury awarded the Deol family non-economic damages totaling $15,065,000.[13] This figure excludes the $500,000 the jury awarded Deol's estate for his pain and mental anguish, the amount of which Gregory and New Prime do not complain. Broken down by damage category and family member, the jury awarded the following.

| | Wife | Each Son | Daughter | Mother | Father |
|---|---|---|---|---|---|
| Loss of past companionship | $350,000 | $160,000 | $160,000 | $160,000 | $160,000 |
| Loss of future companionship | $2,625,000 | $1,200,000 | $1,200,000 | $160,000 | $160,000 |
| Past mental anguish | $525,000 | $160,000 | $5,000 | $160,000 | $160,000 |
| Future mental anguish | $3,937,500 | $925,000 | $92,500 | $160,000 | $160,000 |
| Total | $7,437,500 | $2,445,000 | $1,457,500 | $640,000 | $640,000 |

---

[13] Damages for loss of companionship and society are intended to compensate the beneficiary for the positive benefits flowing from the love, comfort, companionship, and society that the beneficiary would have received had the decedent lived. *Moore v. Lillebo*, 722 S.W.2d 683, 687–88 (Tex. 1986). Mental anguish is concerned not with the benefits the claimants have lost, but with the direct emotional suffering experienced as a result of the death. *Id.* at 688. In awarding damages for mental anguish and loss of society and companionship in a wrongful death case, the trier of fact may consider (1) the relationship between husband and wife, or a parent and child; (2) the living arrangements of the parties; (3) any absence of the deceased from the beneficiary for extended periods; (4) the harmony of family relations; and (5) common interests and activities. *Id.*

As noted *supra*, at trial, neither the Deol family nor the Vasquez/Perales family attempted to quantify the amount of non-economic damages. Instead, during closing arguments, Mr. Dollar, counsel for the Vasquez/Perales family, the family that settled their dispute with Gregory and New Prime during the pendency of this appeal, stated: "But if you don't like any of the [earlier] analysis with respect to damages, then think about it this way . . . [J]ust give them your two cents worth . . . six cents a mile for the six hundred and fifty . . . million miles they traveled in the year that they took these people's lives. . . . Just given them your two cents worth. That's $39 million." During his closing arguments, counsel for the Deol family stated, "I'm not going to recant what Mr. Dollar said, but all of it is all reflected by me as well." The jury awards to the Vasquez/Perales and Deol family members totaled just over $38.8 million.

Clearly, an award on the basis urged at trial would not be a fair and reasonable compensation, as it is not addressed to compensation at all. Instead, it would be punitive and could not survive a meaningful appellate review.

The record before us, in and of itself, does not guide a fact-finder in calculating non-economic damages and does not provide a basis upon which this Court can conduct a meaningful review to determine the amounts awarded are fair and reasonable compensations to the Deol family members. As I noted above, *supra* at p. 9, respect for the jury's decision supported as it is by legally sufficient evidence that the Deol family suffered non-economic injuries, that only the factual sufficiency

of the amount of those damages remain at issue, together with interests of judicial economy to avoid remand and new trial, compel me to suggest resort to an outside source for guidance to uphold the awards.

The Deol family and Gregory and New Prime have provided us with samples of verdicts in other cases. Some of those cases involved the death of more than one family member,[14] some involved a parent's claim for the loss of a minor or teenage child,[15] and in some the non-economic damages were not challenged.[16] I believe the search for comparative awards should be limited to wrongful death cases involving a deceased married adult leaving behind minor children. Relatively few cases fall within this criteria, however.

## 2. The Evidence Presented in This Case

The evidence established that Deol was 45 years old at the time of his death and his life expectancy was 78.4 years. So had Deol survived the accident, he was expected to live another 33 years. At trial, Deol's wife, Jaswinder Chohan, was the

---

[14] *See Atchison, Topeka & Santa Fe Ry. Co. v. Cruz*, 9 S.W.3d 173, 182–86 (Tex. App.—El Paso 1999, pet. granted, judgm't vacated, remanded by agr.) (death of both parents); *Pittsburgh Corning Corp. v. Walters*, 1 S.W.3d 759, 781 (Tex. App.—Corpus Christi–Edinburg 1999, pet. denied) (death of spouse and adult son); *C & H Nationwide, Inc. v. Thompson*, 810 S.W.2d 259, 265 (Tex. App.—Houston [1st Dist.] 1991) (death of spouse and father), *rev'd on other grounds*, 903 S.W.2d 315 (Tex. 1994).

[15] *See Welborn v. Sears, Roebuck & Co.*, 970 F.2d 1420, 1427 (5th Cir. 1992) (death of teenage son); *Russell v. Ramirez*, 949 S.W.2d 480, 486–87 (Tex. App.—Houston [1st Dist.] 1997, no pet.) (same); *Guzman v. Guajardo*, 761 S.W.2d 506, 510–11 (Tex. App.—Corpus Christi–Edinburg 1988, writ denied) (death of minor son); *Gulf States Util. Co. v. Reed*, 659 S.W.2d 849, 855 (Tex. App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.) (death of teenage son).

[16] *See Serv-Air, Inc. v. Profitt*, 18 S.W.3d 652, 662 (Tex. App.—San Antonio 1999, pet. dism'd by agr.); *C & H Nationwide, Inc. v. Thompson*, 810 S.W.2d 259, 265 (Tex. App.—Houston [1st Dist.] 1991), *rev'd on other grounds*, 903 S.W.2d 315 (Tex. 1994).

only witness who testified regarding the effect of Deol's death on her and Deol's family members and about the positive influences Deol had on them.[17] *See Parkway*, 901 S.W.2d at 444 (mental anguish evidence need not come from plaintiffs themselves, but may be provided in the form of third parties' testimony).

Through her testimony, Chohan established she met Deol when she was 17 or 18 years old and Deol was 26 or 27. They both lived in India at the time. Thereafter, Deol's family moved to the United States, and Chohan's family moved to Canada. Chohan and Deol maintained contact and eventually married in 2002.

Three children were born to the marriage of Chohan and Deol, two sons, A.D. and H.D., and one daughter, G.D. The daughter is the youngest of the three. At the time of trial, A.D. and H.D. were 12 and 14 years old, respectively, and G.D. was 4 years old.

Deol became a truck driver and eventually started his own company, Maryland Trucking. Deol was the primary financial provider for the family, and prior to his death, Chohan worked part-time at a toy store and helped Deol with his trucking business.

Deol and Chohan were very close and talked constantly even when he was on the road. Chohan "told Deol everything" and, even though he is deceased, she "still talks to him when she is stressed." Chohan described Deol as the love of her life.

---

[17] Chohan testified the children were at home in Bakersfield, California, with their grandparents. She explained she did not bring the children to court because she did not want them to hear about the accident. She stated it was hard for her to be there.

Deol loved to cook, work in the garden, and spend time with his family and delighted in seeing and hearing about his children's accomplishments. Deol also liked to travel, and he often took the family on trips to different places. Deol wanted his children to be well educated and ensured that they took extra classes to get ahead. He did not want them to be truck drivers.

On the night of the accident, Chohan tried calling Deol several times. She was concerned when Deol did not answer because he always answered her calls on the first ring. The next day, she continued to call him but got no answer. It was not until late afternoon that she learned, through Deol's aunt, that Deol had been in an accident. She was not provided with any detail at that time. Frantic to find her husband, Chohan called around to hospitals in Texas to see if Deol had been admitted. She could not find him. Eventually, the police advised Chohan that Deol did not survive the accident. Chohan described that moment as the saddest in her life.

When the children learned of Deol's passing, H.D. sat with Chohan and held her. A.D. went to his room and would not talk to anyone. One of Chohan's sisters took care of G.D., as she was only seven months old at the time. Deol's sons were very attached to Deol, and he was a loving father.

Deol's father made arrangements to bring Deol's body back to Gaithersburg, Maryland, where they were living, for a ceremony and cremation. The children attended the ceremony, during which the boys cried.

Thereafter, Chohan, the children and Deol's parents, who lived with Deol and his family, had to leave their home in Maryland because Chohan could not make the monthly mortgage payments. They moved to Bakersfield, California, to live with Deol's brother, and Chohan began working for him as she now had to financially provide for the family.

Chohan became depressed after Deol's death and began taking prescription medication. At the time of trial, she was still on the medication and she still had all of Deol's personal belongings, including his shoes and electric razor, containing fragments of his beard. Chohan explained she missed Deol every single moment. When the children do new things, it makes her sad that he is not there to share the moment. She has no one to talk to now. Going to things like parent-teacher conferences also makes her sad. While Chohan described her sadness and depressed state through the time of trial, she did not speak to the likely duration of her mental anguish or indicate she was in need of counseling presently or in the future.

As to Deol's eldest son, H.D., the jury did not hear any evidence of the likely duration of his mental anguish or the need for therapy or other treatment. Rather, Chohan relayed that H.D. used to be happy, now he is very quiet, and "stays to himself." She recounted that H.D. was given two tickets to his middle school graduation. He brought one ticket home telling Chohan "we do not need two." He then went to his room and cried. Deol and H.D. used to play video games, ride bikes,

and play basketball together. Deol used to put H.D. and A.D. to bed, and he would stay with them until they fell asleep.

As to Deol's son A.D., the jury likewise did not hear any evidence of the likely duration of A.D.'s mental anguish or the need for therapy or other treatment. Rather, Chohan described A.D. as being similar to Deol. She stated that, since Deol's death, A.D. has gained a lot of weight because he is less active than he used to be. Before Deol's death, Deol and A.D. often did things together, now A.D. just sits with Chohan and reads. Chohan claimed A.D. seems depressed most days and indicated he often talks about his father and thinks about what they would have done had Deol still been alive. A.D. was in a gifted program in his school in Maryland. After the move to California, that was no longer an option, as Chohan could not afford to pay for extra classes.

H.D. and A.D. commented about what they remember about their dad and what they miss. They remember playing with him and going to different places. Now there is no adult male to play with them, and they do not travel because Chohan does not like to drive on the highway and they do not have the financial resources to pay for travel. Both boys continue to cry out for their father.

G.D. was only seven months old when Deol died. At the time of trial, she was four years old. The jury did not hear any evidence of G.D.'s mental anguish. Rather, Chohan explained that G.D. asks a lot of questions about her dad. Every day she asks when he is going to come home, and she now tells people she does not have a

dad. She is trying to "figure out why she is different" from other children and does not have a dad.

At the time of trial, Deol's mother and father were 75 and 80 years old, respectively. They learned of Deol's death when police officers arrived at their home in Gaithersburg, Maryland. Deol and his mother were very close. They used to cook and garden together. Since Deol's death, Deol's mother is always crying, and she has aged significantly. While Deol's father does not cry in front of Chohan, she explained that since Deol's death, the entire family's living environment is sad. Everything has changed. The jury did not hear any evidence concerning the likely duration of the mental anguish or the need for therapy or other treatment of any of the family members.

### a.  *Non-economic Damages Awarded to Surviving Spouses*

In *Badall v. Durapersad*, the court of appeals affirmed awards of $105,000 for loss of companionship and $41,240 for mental anguish to the wife of a 56 year old man shot and killed in a tire shop he owned. 454 S.W.3d 626, 639–40 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). In that case, Durapersad testified that her husband's death left her without her soul mate, her everything. She missed him every day. *Id.* at 632. She acknowledged she and her husband had some arguments and disagreements. *Id.* She claimed to have suffered a heart attack as a result of her husband's death, to no longer sleep well, and to have been in and out of doctors' offices and the hospital since her husband's death. *Id.* Durapersad indicated that for

most of the six years preceding her husband's death, she worked in Louisiana and came to Texas on the weekends to be with her husband. *Id.* She had retired a few months before her husband's death to spend more time with him. *Id.*

In *Thomas v. Uzoka*, the court of appeals affirmed awards of $100,000 for past mental anguish, $50,000 for future mental anguish, $100,000 for past loss of companionship and $450,000 for future loss of companionship to the wife of a taxi-cab driver who had been killed in a head-on collision. 290 S.W.3d 437, 456 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The evidence established that during the first few years of their marriage, Uzoka and her husband lived in different cities because they were enrolled in different universities. *Id.* They saw each other on the weekends. *Id.* At trial, Uzoka testified she and her husband planned to get a nice apartment together when they graduated from college and to have a formal wedding, as they had married at the courthouse without a significant ceremony. *Id.* They also planned to have at least two, and possibly as many as four, children. *Id.*

In *Phillips v. Bramlett*, the court of appeals concluded that awards of $1,000,000 to Bramlett for mental anguish and $1,265,000 for loss of companionship in connection with the death of his wife following a mis-performed hysterectomy were supported by factually sufficient evidence. 258 S.W.3d 158, 174–176 (Tex. App.—Amarillo 2007, no pet.), *rev'd on other grounds*, 288 S.W.3d

876 (Tex. 2009).[18]  The evidence presented in that case established Bramlett and his wife enjoyed a harmonious relationship in which each was a full partner in the marriage.  Their work schedules left little time for outside interests, and Bramlett and his wife spent their time raising a family and furthering their collective goals. *Id.* at 174.  Bramlett testified that since his wife's death, his life had become empty. *Id.*  In addition, there was evidence of the nature, duration, and severity of Bramlett's mental anguish.  Although it had been three years since Bramlett's wife's death, he still felt the same, and he thinks he hears his wife in the house.  *Id.*

In *Columbia Medical Center of Las Colinas v. Hogue*, this Court affirmed awards of $750,000 for past loss of consortium, $1,250,000 for past mental anguish, $1,750,000 for future loss of consortium, and $600,000 for future mental anguish to the wife of a man who died while seeking medical assistance for pulmonary and cardiac issues.  132 S.W.3d 671, 684 (Tex. App.—Dallas 2004), *aff'd in part, rev'd in part on other grounds*, 271 S.W.3d 238 (Tex. 2008).  In affirming these awards, this Court considered testimony that the decedent and his wife were married for 26 years, and when he died, "half of [her] died"; decedent spent considerable time with his wife and two sons visiting his sons often at college and talking with one of his sons over the phone several times a week; his sons were everything to him, they had

---

[18] The Texas Supreme Court concluded the damage caps in the Medical Liability Act and Insurance Improvement Act applied.

a great bond and were best friends; decedent coached his sons in sports; overall, the relationship of decedent with his family was strong and good. *Id.* at 684, 686.

The substantial range of non-economic awards to surviving spouses from a total of $146,240 in *Badall v. Durapersad* to $4,350,000 in *Columbia Medical Center of Las Colinas v. Hogue* to $7,437,500 in this case highlights the problem with the current adherence to the proof standards dictated by *Saenz* at the trial court level and the apparent lack of objectively predictable appellate review guidelines. Nevertheless, these cases would appear to demonstrate that the jury's awards of non-economic damages to Chohan in this case are excessive.

### b. Non-economic Damages Awarded to Children of the Deceased

In *Wackenhut Corrections Corp. v. de la Rosa*, the court of appeals affirmed awards of $2,000,000 for future mental anguish and $2,000,000 for future loss of consortium to the daughters of de la Rosa who was brutally murdered by two inmates while incarcerated at a Wackenhut Corrections' facility. 305 S.W.3d 594, 608, 636–40 (Tex. App.—Corpus Christi–Edinburg 2009, no pet.). De la Rosa was an honorably discharged former National Guardsman, who was serving a six-month sentence in connection with the possession of less than 1/4 gram of cocaine. *Id.* at 600. A few days before his expected release, De la Rosa was beaten to death by two other inmates using a lock tied to a sock, while Wackenhut's officers stood by and watched, and Wackenhut's wardens smirked and laughed. *Id.* In that case, several witnesses testified as to the effect of De la Rosa's death on his three daughters,

including the daughters themselves. De la Rosa's widow testified De la Rosa was very excited to have children and about his loving and nurturing relationships with his daughters. *Id.* at 638. She testified about their reactions to De la Rosa's death and indicated that they cry and are very sad. *Id.* De la Rosa's sister also testified about the effect of De la Rosa's death on his daughters. The oldest daughter tattooed her father's name on herself because she did not want to let him go. *Id.* The oldest daughter was eighteen years old at the time of trial. She testified about how much she loved her father and how sad she was that he was not at her graduation and that she would miss him at important times in her life such as when she gets married and has a child. *Id.* at 639. De la Rosa's other daughters testified about how much they loved and missed their father. While De la Rosa and his wife had been separated for some time, his wife testified she was sure De la Rosa would be involved in their lives upon release from prison and she and De la Rosa intended to discuss reconciliation upon his release. *Id.*

In *Phillips v. Bramlett*, the Amarillo court of appeals concluded that awards of $1,000,000 to each of Vicki Bramlett's sons for mental anguish and $2,250,000 for loss of companionship were supported by factually sufficient evidence. 258 S.W.3d at 175–176. The evidence presented in that case established that as a result of Vicki's death, her sons moved to Oregon to be near Vicki's twin sister. *Id.* at 176. Although the move had helped, things were not the same. *Id.* The sons testified that they think about their mother almost every day. *Id.* The court noted that the

evidence "was demonstrative of the significant role that Vicki played in the lives of the boys." *Id.* at 174. She was their personal mentor in all things. *Id.* The court further noted that the relationship Vicki's sons had with Vicki was strong, they lived with Vicki at the time of her death, there were no extended absences by anyone from the home, and they shared interests, most significantly, the lives of each other. *Id.* at 175.

In *Fibreboard Corp. v. Pool*, the court of appeals affirmed a total award of $25,000 for loss of companionship to the seven minor children of a man who died from asbestos exposure.[19] 813 S.W.2d 658, 684 (Tex. App.—Texarkana 1991, writ denied). One of the deceased's sons testified his father "pushed the children hard" because he wanted them to excel, that he was a good role model, that he was supportive of the children, and that he was always available to help them with their problems. *Id.* The deceased's wife testified that her children's father was a good family man and was good with the children. *Id.* The court of appeals concluded, "[e]vidence of a father who is a good role model and who is always around to help his children, with no evidence to the contrary, is sufficient to support the award of damages." *Id.*

The range in these damages from $6,700 to $4,000,000 once again appears to demonstrate the lack of consistent or predictable standards of review in this area.

---

[19] Adjusting for inflation, the award would be $47,000, so approximately $6,700 per child.

The breadth of the range on highly similar fact patterns presents a challenge in identifying anything beyond the range itself. There is obviously a potential for inadequate damages at the low end and excessiveness at the other. Operating on the assumption that each, and thus all, of these appellate courts adhered to the dictate of "meaningful" review, we would be left to choose between the minimum and maximum approved awards or an average, assuming these cases are sufficient in number to permit the comparison to support the judgment.

### c.       *Non-economic Damages Awarded to Parents of the Deceased*

In *Wackenhut Corrections Corp. v. De la Rosa*, the Corpus Christi Court of Appeals affirmed awards of $2,500,000 for past mental anguish, $2,500,000 for future mental anguish, $2,500,000 for past loss of consortium, and $2,500,000 for future loss of consortium to De la Rosa's mother. 305 S.W.3d at 642. The evidence at trial established De la Rosa's mother was very close to her son and enjoyed a strong relationship with him—so much so that he named his first-born child after her. *Id.* at 640. The family spent weekends together and family holidays, and De la Rosa's mother was particularly proud of her son, a former National Guardsman. *Id.* She suffered severe emotional distress due to the brutal murder of her child in the custody of, and at the hands of, those who were charged with his protection. *Id.* The testimony showed that the wardens smirked and laughed while De la Rosa was beaten to death and De la Rosa was beaten so badly that his mother did not recognize him when he was being identified at the funeral home. *Id.* at 641. The testimony

further showed that De la Rosa's mother clung to her son's picture and cried every night, wishing that her own death would come sooner so that she could join her son. *Id.*

In *Page v. Fulton*, the Beaumont Court of Appeals affirmed an award of $150,000 for pecuniary loss, loss of companionship and mental anguish to the parents of the deceased who was murdered by her husband.[20] 30 S.W.3d 61, 72–73 (Tex. App.—Beaumont 2000, no pet.). The court noted there was little evidence in the record as to the effect of the daughter's death on her father other than his dogged determination to pursue his former son-in-law. *Id.* at 72. Because a single question was submitted to the jury for both parents, the court noted that the award could be upheld if there was evidence supporting the award for either parent. *Id.* at 72–73. The evidence established the family was close and enjoyed frequent contact and that eight years after her death, her mother could barely think about it. *Id.* at 73. Not only was their daughter murdered, her parents had to slowly come to the realization that a loved and trusted member of the family was responsible for her death. *Id.*

In *Pittsburgh Corning Corp v. Walters*, the Corpus Christi Court of Appeals affirmed awards of $145,375.54 to each of the parents of the deceased who died from mesothelioma.[21] 1 S.W.3d 759, 781 (Tex. App.—Corpus Christi–Edinburg 1999, pet. denied). The evidence established the deceased was the only son of the

---

[20] Adjusting for inflation, the award would be approximately $225,000.

[21] Adjusting for inflation, the awards would be approximately $225,000 to each parent.

Walters and they relied on him to provide substantial support due to their age and health. *Id.* His death left his parents with no other family. *Id.*

Again, the vast range of awards from $225,000 (after adjusting for inflation) to $10,000,000 seems to demonstrate the chronic nature of the review problem that *Saenz* and its progeny set out to resolve. The evidence concerning the effect of Deol's death upon his parents is most akin to that presented in *Walters*; thus I conclude the awards of $640,000 to Deol's parents are potentially excessive, though to what extent is difficult to discern from the relatively few cases available and their wide range.

## D.  Remittitur or Remand

Because I am issuing a dissenting opinion, I ultimately need not determine whether there are enough awards in cases with similar data points to suggest remittiturs here or whether a remand for a retrial would be the appropriate remedy. In all events, I find the record bereft of any evidentiary basis for the jury's decision to award approximately $15 million in damages to the Deol family and cannot join the majority in affirming the judgment without either reformation by some meaningful attempt at remittitur or a remand for a new trial.

180167CF.P05

/David J. Schenck/
DAVID J. SCHENCK
JUSTICE

Browning, and Richter, J.J., join in this concurring and dissenting opinion.